**UNITED STATES of America, Appellant,**

v.

**Ronald A.X. STOKES, Defendant, Appellee.**

**No. 97–1118.**

United States Court of Appeals, First Circuit.

Heard July 31, 1997.

Decided Aug. 22, 1997.

---

Donald K. Stern, United States Attorney, with whom Andrea N. Ward, Assistant United States Attorney, was on brief, for appellant.

James S. Dilday, with whom Derege B. Demissie and Grayer & Dilday, were on brief, for defendant, appellee.

Before SELYA, Circuit Judge, HILL,* Senior Circuit Judge, and BOUDIN, Circuit Judge.

SELYA, Circuit Judge.

The United States appeals from the dismissal, on due process grounds, of an indictment against defendant-appellee Ronald A.X. Stokes. Because the district court acted improvidently and in excess of its authority, we reverse.

## I. BACKGROUND

The factual foundation of the case is laid elsewhere, *see United States v. Stokes,* 947 F.Supp. 546 (D.Mass.1996); *Commonwealth v. Stokes,* 38 Mass.App.Ct. 752, 653 N.E.2d 180, *review denied,* 421 Mass. 1103, 655 N.E.2d 1277 (1995), and a sketch suffices for present purposes.

Boston police officers arrested Stokes on December 6, 1990, and charged him with first-degree murder, unlawful carriage of a firearm (an AK–47 semi-automatic rifle), and two counts of assault and battery with a dangerous weapon. On August 11, 1992, a state court jury acquitted him on the murder charge, but convicted him on the other three

---

* Of the Eleventh Circuit, sitting by designation.

counts. Mindful of both the circumstances of the crimes and the defendant's recidivism, the judge sentenced him at or near the statutory maximum for each count and made the sentences consecutive. Stokes' anticipated release date from state confinement is in 2006.

The federal government knew of Stokes' case no later than June 9, 1993. Still, the federal behemoth did not stir until December 5, 1995, when the United States charged Stokes with being a felon in possession of a firearm. *See* 18 U.S.C. § 922(g)(1) (1994). Stokes moved to dismiss the federal indictment on temporally oriented grounds. He averred that the prosecution was time-barred and that the protracted preindictment delay violated (a) his Fifth Amendment right to due process, (b) his Sixth Amendment right to a speedy trial, and (c) the strictures of Fed.R.Crim.P. 48(b). Following a hearing, the district court took the unorthodox step of submitting a series of interrogatories to the government *sua sponte*.

In the course of those proceedings, the government explained, among other things, that this prosecution would further the federal interest in protecting the public from a violent criminal. The government noted that Stokes, who had accumulated an unrelieved record of bellicose criminality, on this occasion had wielded a particularly lethal weapon, and that, if·he were to be convicted on the federal charge, he could be punished as an armed career criminal.[1] The court eventually rejected each of Stokes' claims. Because the five-year statute of limitations commenced running on December 7, 1990, the indictment, handed up on December 5, 1995, was timely. *See United States v. Stokes*, 947 F.Supp. at 550. Because the defendant made no showing that preindictment delay caused him actual prejudice or emanated from a prosecution effort to gain an unfair tactical advantage, Stokes' Fifth Amendment claim failed. *See id.* at 551. Because an accused's constitutional right to a speedy trial does not attach until the filing of a charge, the Sixth Amendment offered Stokes no shel-

ter. *See id.* at 552. And, finally, the court ruled that Criminal Rule 48(b) does not apply to preindictment delay. *See id.*

Had the district court stopped at this juncture, these proceedings would be unnecessary. But the judge brooded over the sentencing possibilities. Noting that, regardless of the earlier acquittal, Stokes' sentence could be enhanced to life imprisonment without parole if the government obtained a conviction on the federal weapons charge and then proved at sentencing by a preponderance of the evidence that he had committed the murder, *see generally* USSG § 2K2.1; USSG § 1B1.3(a), the judge foresaw "vexing issues" of due process, double jeopardy, and selective prosecution. *United States v. Stokes*, 947 F.Supp. at 553. While acknowledging that the prosecution transgressed no established constitutional doctrine, he identified four factors which, in his estimation, gave rise to "constitutional implications": (1) the substantial preindictment delay; (2) a *de facto* successive prosecution for the same firearms offense, albeit by a different sovereign, exacerbated by the prospect of a disparate sentence of mandatory life imprisonment; (3) a *de facto* reprosecution, in the guise of a sentencing enhancement, for acquitted conduct (the murder) under a less rigorous standard of proof; and (4) a form of selective prosecution. *Id.* at 556–57. He then proceeded to dismiss the indictment, reasoning that "[a]lthough no one factor, by itself, may offend constitutional canons, the effect of all of the factors in the aggregate ... violates the Due Process Clause." *Id.* at 557. This appeal ensued.

## II. DISCUSSION

■ Because the district court's dismissal of the indictment on constitutional grounds raises a pure question of law, we exercise plenary review. *See United States v. Nippon Paper Indus. Co.*, 109 F.3d 1, 3 (1st Cir.1997), *petition for cert. filed*, 65 U.S.L.W. 3839 (U.S. June 13, 1997) (No. 96–1987); *United States v. Aguilar–Aranceta*, 957 F.2d

---

1. The United States Attorney obtained an authorized waiver from the Justice Department's Petite policy, an aspirational protocol which seeks to prevent overlapping federal-state prosecutions absent a compelling federal interest. *See generally United States v. Gary*, 74 F.3d 304, 313 (1st Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 2567, 135 L.Ed.2d 1084 (1996).

18, 21 (1st Cir.1992). We begin with the court's aggregation theory and then turn to the court's preoccupation with possible sentencing outcomes. We conclude by considering various alternative grounds proffered by the appellee in an attempt to salvage the judgment.

### A. *Aggregate Effect.*

█ The cornerstone of the district court's order is its conclusion that a medley of constitutional concerns, each insufficient to bar prosecution, added up to a due process violation and required dismissal of the indictment. The district court cited *United States v. Lombard*, 72 F.3d 170 (1st Cir.1995) (*Lombard I*), as the sole authority for this aggregation theory. *Lombard I* is well wide of the mark.

A state court jury acquitted Lombard on murder charges. A federal court jury subsequently convicted him on federal firearms charges arising out the same nucleus of operative facts. The trial judge imposed a mandatory life sentence based on preponderant evidence that Lombard used the weapons to commit the murders (of which he previously had been acquitted). *See id.* at 172. Expressing but not resolving constitutional concerns about, inter alia, the magnitude of the sentence enhancement, the prior acquittal, the qualitative difference between the sentence-enhancing conduct and the offense of conviction, and the severity of the sentence imposed, the court held that this combination of special facts permitted the district court to consider a downward departure at sentencing. *See id.* at 180, 184–85; *see also United States v. Lombard*, 102 F.3d 1, 2 (1st Cir. 1996) (*Lombard II*) (explicating previous panel decision), *cert. denied,* —— U.S. ——, 117 S.Ct. 2437, 138 L.Ed.2d 197 (1997).

*Lombard I* offers no support for the dismissal of the indictment in this case. *Lombard I* is a sentencing case, elaborating on departure principles, and its analysis is unique to the milieu of the federal sentencing guidelines. *See Lombard I*, 72 F.3d at 183–87; *see generally Koon v. United States,* —— U.S. ——, —— – ——, 116 S.Ct. 2035, 2044–45, 135 L.Ed.2d 392 (1996). Judge Harrington transposed the statements contained in *Lombard I* from the sentencing context to the pretrial context. Tugging those statements so far from their moorings empties them of meaning.

Moreover, Judge Harrington's reading of *Lombard I* is undone by *Lombard II* (which, in all fairness, was decided some two weeks after Judge Harrington ruled). *Lombard I* resulted in a remand for further consideration of the appropriate sentence. 72 F.3d at 187. *Lombard II* upheld the district court's denial of a downward departure and its reimposition of a sentence of life imprisonment. 102 F.3d at 2–3, 5. This result refutes Judge Harrington's vision of *Lombard I* as the progenitor of a new constitutional dogma. The short of it is that the district court did not cite, and we have not unearthed, any authority for the proposition that individual factors, none of which crosses constitutional boundaries, may violate the Constitution in the aggregate. While perhaps some strange concatenation of circumstances lurks at the outer periphery of constitutional doctrine, we are confident that, on the facts of this case, the whole is no more than the sum of the parts.

█ In a gallant effort to hold his gains, Stokes' able counsel points out that we have recognized in other contexts the principle of cumulative effect. *See, e.g., United States v. Sepulveda*, 15 F.3d 1161, 1195–96 (1st Cir.1993); *United States v. Dwyer*, 843 F.2d 60, 65 (1st Cir.1988). That is true as far as it goes—but it does not go very far. While trial errors which in isolation appear harmless may have a cumulative effect so prejudicial as to require reversal, the operation of that principle depends on the existence of two or more errors. By definition, cumulative-error analysis is inappropriate when a party complains of the cumulative effect of non-errors. *See Hoxsie v. Kerby*, 108 F.3d 1239, 1245 (10th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 126, —— L.Ed.2d —— (1997). Here, as Judge Harrington himself concluded, each individual claim of constitutional error misfires. Thus, we cannot endorse the curious alchemy by which the lower court transformed an array of constitutionally acceptable factors into a constitutional abomination.

### B. *Sentencing Considerations.*

The court below dwelt at some length on the potentially severe sentence that Stokes might receive if he were convicted on the federal charge. The court's reliance on this factor as a basis for granting relief was at best premature.

In the normal course of events, a facially valid indictment returned by a duly constituted grand jury calls for a trial on the merits. *See Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956); *United States v. Rodriguez,* 738 F.2d 13, 16 (1st Cir.1984). Because the public maintains an abiding interest in the administration of criminal justice, dismissing an indictment is an extraordinary step. *See United States v. Morrison,* 449 U.S. 361, 363–64, 101 S.Ct. 665, 666–67, 66 L.Ed.2d 564 (1981). Even when evidence of a constitutional infraction looms, remedies ordinarily "should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *Id.* at 364, 101 S.Ct. at 667. Thus, an indictment should not be dismissed with prejudice when other means exist to correct a constitutional breach. *See id.* at 365, 101 S.Ct. at 668; *cf.* *United States v. Hastings,* 847 F.2d 920, 928–29 (1st Cir.1988).

This principle applies in regard to sentencing: when the supposed constitutional infirmity derives from particular attributes of a sentence imposed, the scope of relief is limited to excising the taint from the sentence. *See, e.g., Coker v. Georgia,* 433 U.S. 584, 600, 97 S.Ct. 2861, 2870, 53 L.Ed.2d 982 (1977); *United States v. Connell,* 960 F.2d 191, 196–97 (1st Cir.1992). Though we take no view as to whether the concerns to which the district court alluded might warrant relief at the sentencing stage, *see generally United States v. Saldana,* 109 F.3d 100, 104 (1st Cir.1997) (acknowledging the possibility that the timing of an indictment might, in some circumstances, "produce[ ] sentencing consequences so unusual and unfair that a departure would be permissible"), those concerns are properly reserved for consideration at the time of sentencing.[2] They have no bearing on the question of whether a trial should go forward.

The anatomy of the doctrine of preindictment delay strengthens our conviction that Judge Harrington prematurely considered post-conviction possibilities. Dismissal for preindictment delay on due process grounds requires, inter alia, a showing of actual prejudice. *See United States v. Marion,* 404 U.S. 307, 325–26, 92 S.Ct. 455, 465–66, 30 L.Ed.2d 468 (1971); *Acha v. United States,* 910 F.2d 28, 32 (1st Cir.1990) (per curiam). Accordingly, courts regularly have found claims of prejudice related to sentencing possibilities too speculative to implicate a defendant's due process right. *See, e.g., United States v. Martinez,* 77 F.3d 332, 336 (9th Cir.1996) (rebuffing the defendant's pretrial claim of prejudice from the effects of preindictment delay on his likely sentence because the guidelines provided leeway for departures); *United States v. McCoy,* 977 F.2d 706, 711 (1st Cir.1992) (rejecting as conjectural the argument that preindictment delay reduced the defendant's opportunity to serve concurrent terms on state and federal charges). So it is here: whether Stokes' case ultimately will reach the sentencing stage, and if so, what sentence will be imposed, are questions reserved for an uncertain future. By premising his analysis of the indictment's trialworthiness on the constitutional implications of a life sentence not yet imposed (and, perhaps, never to be imposed), Judge Harrington jumped the gun by several paces.

To recapitulate, sentencing issues are properly addressed during the sentencing phase of federal criminal trials. The district court's flagrant contradiction of this tenet constituted legal error.

### C. *Miscellaneous Grounds.*

Stokes attempts to confess and avoid. If the district court erred in its reasoning, he

---

2. We note in passing that one of the principal constitutional concerns underlying the district court's opinion, 947 F.Supp. at 553, has proven to be unfounded. *See United States v. Watts,* —— U.S. ——, ——––——, 117 S.Ct. 633, 637–38, 136 L.Ed.2d 554 (1997) (per curiam) (upholding the constitutionality of considering acquitted conduct, under a preponderance standard, for sentence-enhancement purposes).

says, its result nevertheless is defensible as a condign remedy for prosecutorial vindictiveness, or as a concinnous exercise of the court's supervisory powers, or because the district court erred when it failed to dismiss the indictment on the basis of preindictment delay. We weigh each asseveration.

**1. Prosecutorial Vindictiveness.** It is hornbook law that a federal court may dismiss an indictment if the accused produces evidence of actual prosecutorial vindictiveness sufficient to establish a due process violation, or even if he demonstrates a likelihood of vindictiveness sufficient to justify a presumption. See *United States v. Goodwin*, 457 U.S. 368, 376, 380 n. 12, 102 S.Ct. 2485, 2492 n. 12, 73 L.Ed.2d 74 (1982); *United States v. Marrapese*, 826 F.2d 145, 147 (1st Cir.1987). Seizing on a singular reference in the closing paragraph of Judge Harrington's opinion,[3] Stokes urges us to uphold the court's "finding" that prosecutorial vindictiveness occurred here. In mounting this challenge, Stokes eschews a claim of actual vindictiveness, arguing instead that a presumption of vindictiveness arises from the government's admission that it would not have prosecuted Stokes federally had he been convicted of murder (and, therefore, given a substantially longer sentence) in the state court.

We begin this segment of our analysis with a caveat: courts should go very slowly in embracing presumptions of prosecutorial vindictiveness in pretrial proceedings. See *Goodwin*, 457 U.S. at 381, 102 S.Ct. at 2492. Here, moreover, the allegation of vindictiveness is not only oddly timed, but also oddly configured. The sovereign is not alleged to have retaliated, as in the typical case, because an accused, embroiled in a legal battle with it, asserted a legal right. See, e.g., *Blackledge v. Perry*, 417 U.S. 21, 28–29, 94 S.Ct. 2098, 2102–03, 40 L.Ed.2d 628 (1974); *North Carolina v. Pearce*, 395 U.S. 711, 724–25, 89 S.Ct. 2072, 2079–80, 23

L.Ed.2d 656 (1969). Rather, the *federal* government is alleged to be acting vindictively in retaliation for an accused's victory in a *state* case. Since it is well settled that "the conduct of two independent sovereigns does not lend itself to the concept of vindictive prosecution," *United States v. Bassford*, 812 F.2d 16, 20 (1st Cir.1987) (quoting *United States v. Ng*, 699 F.2d 63, 68 (2d Cir.1983)), this is a difficult sale to make.[4]

The level of difficulty increases due to the breadth of the prosecutor's discretion. A federal prosecutor does not have the resources (time, money, staff) to charge every suspected malefactor. In picking and choosing, the prosecutor must act in a fair and even-handed manner, and he is constrained by a set of rules and conventions (both legal and ethical). But prosecutors are not required to function as bloodless automatons: they may (indeed, they should) make judgments about dangerousness, set priorities, and give heightened attention to cases which inspire a sense of outrage. This case illustrates the point: the government's decision to refrain from initiating federal criminal proceedings pending the outcome of a parallel (but independent) state prosecution, and to relax the self-imposed restraint only after it had been disappointed by the end result of the parallel proceeding, falls squarely within the encincture of this prosecutorial discretion. See *United States v. Fuzer*, 18 F.3d 517, 520 (7th Cir.1994); *Ng*, 699 F.2d at 68–69. The record indicates that Stokes is a dangerous criminal, and the federal government had a perfect right to take a hard look at his case and to determine whether society's interests call for the unusual step of instituting a federal prosecution notwithstanding the prior commencement of a state prosecution for substantially the same conduct.

We need not wax longiloquent. Simply put, the district court's inscrutable reference to vindictiveness fails to compensate for the utter absence of any circumstances from

---

**3.** The judge wrote, somewhat cryptically: "It is not fitting for the United States to be vindictive...." *United States v. Stokes*, 947 F.Supp. at 557.

**4.** Among other things, showing vindictive prosecution where two separate sovereigns are involved would require a finding of complicity between federal and state prosecutors. See *Bassford*, 812 F.2d at 20–21; *Ng*, 699 F.2d at 68. There is no basis for such a finding here.

which a trier legitimately could presume vindictiveness. *See United States v. Sutherland,* 929 F.2d 765, 772 n. 2 (1st Cir.1991) (noting that conclusory allegations are insufficient when the record lacks any competent evidence of vindictiveness).

**2.** *Supervisory Powers.* The dismissal is equally vulnerable if viewed as an exercise of the district court's supervisory powers. Such powers enable courts, within limits, to formulate procedural rules not specifically contemplated by the Constitution or codified in positive law. *See United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983). Thus, courts may invoke their supervisory powers to implement a remedy for violation of recognized rights, to preserve judicial integrity, or to deter illegal conduct. *See id.; see also United States v. Horn,* 29 F.3d 754, 760 (1st Cir.1994). Even so, courts must use these powers "sparingly." *United States v. Santana,* 6 F.3d 1, 10 (1st Cir.1993).

The district court did not explicitly invoke its supervisory powers, but it did voice lingering concerns about "fundamental fairness" and "fair play." *United States v. Stokes,* 947 F.Supp. at 557. Stokes reads these references as reflecting the court's belief that the government somehow abused its prosecutorial discretion in lodging the indictment and thus denied Stokes substantive due process. The facts do not bear out this theory.

Although dismissing an indictment on substantive due process grounds is not unprecedented, it is extremely rare. Such a drastic step is reserved for cases of "serious and blatant prosecutorial misconduct that distorts the integrity of the judicial process." *United States v. Giorgi,* 840 F.2d 1022, 1030 (1st Cir.1988) (citation omitted). The instant case does not present a suitable occasion for dismissing an indictment in order to vindicate the court's supervisory authority.

In this vein, Stokes' flagship case, *United States v. Rodman,* 519 F.2d 1058 (1st Cir. 1975) (per curiam), gains him little headway. There, we upheld the trial court's use of inherent power to dismiss charges after the government breached a promise to recommend against indictment in return for information which included self-incriminating statements. *See id.* at 1059–60. *Rodman* illustrates the sort of egregious circumstances which are essential before a court appropriately may unleash its supervisory powers to interfere with the exercise of prosecutorial discretion. The case at bar—in which the government had the discretion to initiate a federal prosecution and punctiliously followed applicable internal procedures in doing so—is not of that genre.

We give short shrift to Stokes' related allegation that the indictment was subject to dismissal because of prosecutorial abuse of sentence enhancers. A pretrial dismissal on this basis constitutes a totally inappropriate use of the court's supervisory powers. *See supra* Part II(B); *see also Horn,* 29 F.3d at 760 (warning that courts may not employ their inherent powers to justify extreme remedies when "satisfactory anodyne[s]" exist which are "more narrowly tailored to the objective").

Finally, to the extent that Judge Harrington was influenced in his ruling by his evident personal disagreement with the government's decision to prosecute Stokes under federal law, his action was inappropriate. It is a bedrock principle of our system of criminal justice that "the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment." *United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977); *accord Santana,* 6 F.3d at 11 (reading Supreme Court precedent as "admonishing federal courts to refrain from using the supervisory power to conform executive conduct to judicially preferred norms by dismissing charges" without sufficient legal cause).

In sum, the record contains no inkling of prosecutorial misconduct, vindictiveness, or other conduct antithetic to substantive due process which could justify dismissing the indictment through the exercise of the court's supervisory powers.

**3.** *Preindictment Delay.* Stokes' renewed claim of unconstitutional preindict-

ment delay lacks substance. A criminal defendant who asserts such a claim bears the heavy burden of showing not only that the preindictment delay caused him actual, substantial prejudice, but also that the prosecution orchestrated the delay to gain a tactical advantage over him. *See Marion,* 404 U.S. at 324, 92 S.Ct. at 465; *United States v. Henson,* 945 F.2d 430, 439 (1st Cir.1991). The appellee shows neither.

▇ Stokes argues that he satisfied the first prong of the test because, had the federal government promptly indicted him, he would have continued searching for a potential defense witness, Sherry Parkman, who disappeared between the date of the offense and the date of the state court trial. Since the appellee was unable to locate the witness at the time of his state trial, there is no credible reason to believe that the delay on the federal side placed him in a position less advantageous than he would have occupied had the indictments been contemporaneous.[5]

The appellee's fallback position is that the delay prejudiced him by denying him the benefit of running his state and federal sentences concurrently. This is pure speculation and, hence, inadequate to the task. *See McCoy,* 977 F.2d at 711.

▇ At the expense of carting coal to Newcastle, we add that Stokes also fails on the second prong of the test. By all accounts, the government temporized until it knew the result of the state court prosecution. Even then, the government deferred an indictment because it gave priority to the prosecution of offenders who, unlike Stokes, were not already in custody.

The government's explanation is plausible and unimpeached; it should, therefore, be accepted. *See United States v. Marler,* 756 F.2d 206, 215 n. 6 (1st Cir.1985). It indicates that the government acted out of proper motives and achieved no undue tactical advantage. For these reasons, Stokes fails to persuade us that the district court erred in refusing to dismiss the case based on inordinate preindictment delay.

---

**5.** In all events Parkman's statements are ambiguous. *See Commonwealth v. Stokes,* 653 N.E.2d at 185. Because proof of actual prejudice must be

## III. CONCLUSION

We need go no further. It is evident to us that the district court erred as a matter of law in dismissing the case prior to trial. Having obtained a valid indictment within the limitations period, the government is entitled to try the defendant on the merits. Moreover, we think it best that the case be transferred to a new trier on remand, and we so direct. *See, e.g, United States v. Muniz,* 49 F.3d 36, 42–43 (1st Cir.1995); *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.,* 754 F.2d 404, 430 (1st Cir.1985).

*Reversed.*

definite and not speculative, *see Acha,* 910 F.2d at 32, this fact, without more, would sink the appellee's argument.