**UNITED STATES of America**

v.

**Wilbert J. DREW a/k/a Jerome W. Drew, Defendant.**

**No. CRIM. A. 97–471 (JHG).**

United States District Court, District of Columbia.

Sept. 28, 1998.

Archie McRoy Nichols, Tony W. Miles, Federal Public Defender for D.C., Washington, DC, for Wilbert Jerome Drew.

Charles Joseph Harkins, Jr., Andrew C. Phelan, Glenn Michael Lennon, Kevin Edward Byrnes, U.S. Attorney's Office, Washington, DC, for U.S.

### MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

This case requires a renewed focus on one of the most troubling issues presented by the Guidelines Manual promulgated by the United States Sentencing Commission.[1] Under one of the "cross reference" provisions of the Guidelines, § 2K2.1(c), a criminal defendant can effectively be convicted of one crime and sentenced for another—even if the defendant has been acquitted for that other crime. *See United States v. Lombard*, 102 F.3d 1, 4 (1st Cir.1996) [hereafter *Lombard II* ] ("[A] finding of an uncharged crime at sentencing, and the *compulsory* fixing of the sentence on that basis, makes the sentencing itself now look somewhat more like a conviction for that uncharged crime . . .") (emphasis added).

Some circuit courts of appeals have recognized the argument that this provision has the flavor of a "bait and switch" that would violate the Fifth Amendment's Due Process Clause, but they have nonetheless concluded that even when application of the cross reference significantly increases the sentence, such application passes constitutional muster. *See, e.g., United States v. Fenner*, 147 F.3d 360, 365–67 (4th Cir.1998); *Lombard II*, 102 F.3d at 5; *cf. United States v. Hahn*, 960 F.2d 903, 908 (9th Cir.1992) ("In mandating penal consequences for 'relevant conduct' in certain cases, the Guidelines implicate the [due process] principles enunciated in *In re Winship*, 397 U.S. 358[, 90 S.Ct. 1068, 25 L.Ed.2d 368] . . . (1970).").

In this case, defendant Wilbert J. Drew ("Mr. Drew" or "Drew") pled guilty to one count of unlawful possession of a firearm by a person under a civil protection order in violation of 18 U.S.C. § 922(g)(8) (1994 & Supp.). By statute, the maximum sentence that can be imposed for such offense is 10 years. *See* 18 U.S.C. § 924(a)(2). However, under the Guidelines, § 2K2.1, absent a cross reference and by Mr. Drew's calculation, a person with his criminal history would be exposed to a sentence ranging from 30 to 37 months. But if the cross reference provision, § 2K2.1(c), is applied, Drew's sentencing exposure increases more than twofold.

Upon consideration of the evidence introduced at the sentencing hearing held on September 28, 1998, and the entire record herein, the Court is constrained to find that application of § 2K2.1(c) is required because Mr. Drew did assault his wife with a premeditated intent to kill her. As a result, Drew must receive a sentence ranging from 70 to 87 months, and he has today been sentenced by separate Judgment to serve 80 months in prison.

### DISCUSSION

As a matter of sentencing policy, criminal sentences can be based upon a "charge offense" system or a "real offense" system. *See* Julie R. O'Sullivan, *In Defense of the U.S. Sentencing Guidelines' Modified Real–Offense System*, 91 Nw. U.L.Rev. 1342, • 1344 (1997) [hereafter O'Sullivan, *Defense of Modified Real–Offense System* ]. The difference between the systems lies in what information should be presented and considered at sentencing—information pertaining only to the charged offense or other relevant information including that pertaining to uncharged, unconvicted or acquitted offenses related to the charged offense. *See id.* at 1344–45.

For policymakers the choice is not binary, and indeed, the Sentencing Commission adopted a "modified real offense" system as a "key compromise" reflected in the Guidelines. *See, e.g.*, U.S.S.G. 5–6 (1997) (policy statement); U.S.S.G.App. C, Commentary, Background to Amendment 374 (1997) at

---

1. "While the products of the Sentencing Commission's labors have been given the modest name 'Guidelines,' . . . they have the force and effect of laws, prescribing the sentences criminal defendants are to receive." *Mistretta v. United States*, 488 U.S. 361, 413, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (Scalia, J., dissenting).

186–87 ("The firearm statutes are often used as a device to enable the federal court to exercise jurisdiction over offenses that otherwise could be prosecuted only under state law"); *see also* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest,* 17 Hofstra L.Rev. 1, 8–12 (1988); David Yellen, *Illusion, Illogic, and Injustice: Real Offense Sentencing and the Federal Sentencing Guidelines,* 78 Minn. L.Rev. 403, 404 & nn. 3–5 (1993) [hereafter Yellen, *Real Offense Sentencing* ].

█ As a result of the Sentencing Commission's policy choice, the Court at sentencing is to consider all relevant conduct pertaining to the charged offense. U.S.S.G. § 1B1.3(a)(1)(A) (1997). In this case, Drew was charged with the one federal count to which he has pled guilty and twelve counts for D.C.Code violations that have been dismissed. *See United States v. Drew,* 5 F.Supp.2d 16, 17–18 (D.D.C.1998) (describing charges in the indictment). The Court must still consider the conduct underlying the dismissed counts as "relevant conduct" under the Guidelines, if the Government proves by a preponderance of the evidence that such conduct occurred. *See United States v. Pinnick,* 47 F.3d 434, 437 (D.C.Cir.1995).

### A. Relevant Conduct

█ Where the facts regarding relevant conduct are set forth in the presentence investigation report ("PSR"), and the defendant does not object to the probation officer's statement of facts therein, the Court may rely on the PSR to conclude that the defendant committed the acts as stated unless the PSR's statement of the offense conduct is internally contradictory, wildly implausible, or in direct conflict with the evidence heard at trial. *Pinnick,* 47 F.3d at 437. In this case, Mr. Drew has not objected to the following statement of the offense conduct:

9. .... On October 27, 1997, the Honorable Zoe Bush ... issued a one-year [civil protection order] ... which stated that [Drew] "shall not assault, threaten, harass, or physically abuse petitioner (Renay Drew) or her children in any manner." ....

10. On November 1, 1997, at about 2:00 a.m., the defendant telephoned his wife .... The defendant repeated his feelings of despair and Mrs. Drew advised that she was hanging up the telephone. Defendant Drew responded that he was going to do something drastic and, again, his wife responded that she was hanging up the telephone.....

11. At approximately 3:30 a.m., on November 2, 1997, the defendant broke into Mrs. Drew's Washington, D.C. residence ... after shattering a window. Once inside, he went up the stairs to his wife's bedroom. Frightened by the sudden commotion, Mrs. Drew locked her bedroom door and locked herself in a closet with a portable telephone. She dialed 911 for emergency assistance. From the closet area, the victim heard her husband knocking on the bedroom door. He forced the bedroom door open and then forced open the closet door. At gunpoint he forced his wife out of the closet and into the upstairs hallway. The couple's 19–year–old son exited his bedroom and confronted his father, who demanded that he return to his room. Defendant Drew proceeded down the hallway and was then confronted by the couple's 15–year–old son. The couple proceeded down the stairwell and defendant Drew began to talk about how he was tired and how the system had failed him. He instructed his family to call news reporters because he had been failed by the system.

12. At the height of the disturbance, Drew pulled the trigger on the shotgun; his wife begged him not to shoot her. As Drew pulled the trigger, his wife lunged towards him and their two sons joined in to gain control of the situation. The firearm did not discharge. During the altercation, Mrs. Drew was able to retrieve the shotgun from her husband's possession, while their sons held him down to await the arrival of police officers. First District Metropolitan Police De-

partment officers, who had been dispatched to the residence, arrived and placed the defendant under arrest. A loaded Mossberg 12–gauge shotgun was retrieved from the residence.

13. A laboratory analysis report dated November 20, 1997, indicated that the weapon, a Mossberg Model 500, test-fired and was found to be in normal operating condition. The serial number on the firearm had been obliterated.

These undisputed facts, being neither internally contradictory nor wildly implausible, are accepted as true. Additionally, at sentencing the Government introduced testimonial and documentary evidence in the form of the transcripts of grand jury testimony from Renay Drew (Mrs. Drew) (marked as Ex. 2 and hereafter remarked as Ex. 2A), the couple's 15–year–old son (Ex. 3), and the arresting officer (Ex. 4), and the Domestic Violence Intake report and other official documents related to protection orders issued by the Superior Court of the District of Columbia. *See* Gov't's Sent. Mem. Exs. 1–2. Defense counsel relied upon some of these same exhibits in making his argument. Both counsel also relied upon the Forensic Psychological Evaluation conducted at the mutual request of Mr. Drew and the Government by a clinical psychologist at FCI Petersburg. As physical evidence, the Government also introduced the shotgun recovered from the Drew residence on the night in question, the shell with an indentation made by the firing pin and, as demonstrative evidence, a shell with no such indentation. With minor, immaterial discrepancies, the evidence adduced at sentencing fully corroborates the uncontested facts in the PSR recited above.

■ Upon consideration of all the evidence, the Court is constrained to find that on the morning of November 2, 1997, Mr. Drew unlawfully broke into his house with the intent to kill his wife. During the offense, Mr. Drew unlawfully possessed a Mossberg 12–gauge shotgun, which he used to physically restrain Mrs. Drew as he led her down the stairway. Mr. Drew then pointed the gun at Mrs. Drew and pulled the trigger with the premeditated intent to kill her. Although Drew was clearly under some stress, the evidence demonstrates unmistakably that Drew knew what he was doing, knew that it was wrong, and was not compelled by a mental disorder when he tried to kill his wife.[2]

## B. Guidelines Analysis

Under the Guidelines Manual, the sentence for a violation of 18 U.S.C. § 922(g) is calculated by reference to § 2K2.1. Under subsection (a) of that guideline, Mr. Drew would receive a base offense level of 14. His offense level would have been increased by 2 because the serial number on the gun had been obliterated, § 2K2.1(b)(4), and he would have received an additional four-level enhancement for use of the weapon in connection with another felony offense. *See* U.S.S.G. § 2K2.1(b)(5). As is discussed *infra*, an additional upward adjustment of two levels would have been appropriate because he physically restrained his wife during the offense when he forced her down the stairs at gunpoint. That would have brought his offense level to 22. With credit for acceptance of responsibility, § 3E1.1(a) and (b), his total offense level would have been 19. With a criminal history Category I, Mr. Drew's exposure would have been 30 to 37 months of incarceration.

But, "[i]f the defendant used or possessed any firearm or ammunition in connection

**2.** As is discussed *infra*, normally sentencing facts are to be proven by a preponderance of the evidence. *See United States v. Booze*, 108 F.3d 378, 381–82 (D.C.Cir.1997). Some argue that due process requires that if a sentence is to be based on unconvicted conduct, the factual findings regarding that conduct must be made by a heightened standard. *See Kikumura v. United States*, 978 F.Supp. 563, 575–77 (D.N.J.1997) (surveying the legal landscape on this issue). Reluctantly, the Court accepts that the preponderance standard is constitutional even for relevant conduct necessary to the sentence. *Accord Lombard II*, 102 F.3d at 5. However, even if the facts related to Mr. Drew's murder attempt were required to have been proven beyond a reasonable doubt, I find that they were. *Cf. Fenner*, 147 F.3d at 367 & n. 3 (standard of proof not raised or addressed because at sentencing Judge Garbis enhanced the sentence on the basis of his finding beyond a reasonable doubt that defendants had committed murder).

with the commission or attempted commission of another offense ... apply (A) § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is greater than that determined above." U.S.S.G. § 2K2.1(c)(1)(A) (1997). The term "another offense" refers to offenses other than the firearms offense, § 2K2.1 app. n. 18, and the offense level is to be determined under § 2X1.1. *Id.* app. n. 14.

Section 2X1.1 directs that the base offense level be that of the "substantive offense." U.S.S.G. § 2X1.1. It is at this point that the Guidelines shift the focus from the charged offense to the "real" offense because, in the context of this cross reference, the offense on which the sentence will be based is that offense other than the firearms conviction.[3] Section 2X1.1(c)(1) further directs that when another offense guideline covers the attempt offense, that guideline should be used.

Here, on the facts as found above, § 2A2.1 (Assault With Intent to Commit Murder; Attempted Murder) applies. Under this guideline, the base offense level depends upon whether the attempt was first degree or second degree murder as defined by 18 U.S.C. § 1111 (1994 & Supp.). *See* U.S.S.G. § 2A2.1 app. n. 2. That statute provides that "[e]very murder perpetrated by ... any ... willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any ... murder,

kidnaping, ... burglary ... is murder in the first degree." 18 U.S.C. § 1111. The findings of fact above demonstrate that Mr. Drew had the requisite state of mind, and took sufficiently premeditated actions to constitute attempted first degree murder within the meaning of § 2A2.1(a)(1).

Therefore, Drew's base offense level is 28. *See* U.S.S.G. § 2A2.1(a)(1). The Court finds that a two-level enhancement under § 3A1.3 for restraining his victim is appropriate, and Drew's offense level rises to 30.[4] After receiving credit for acceptance of responsibility, his total offense level is 27.[5] With a criminal history Category I, Drew must receive a sentence ranging from 70 to 87 months of incarceration absent any departure.

## C. Departures

At sentencing, the Government argued for an upward departure from the above-stated sentencing range, and Drew argued for a downward departure. The Court finds neither argument to be persuasive; there will be no departure in this case.

█ The Government advanced two arguments in favor of an upward departure: (1) either Mr. Drew's criminal history category inadequately represents the seriousness of his past conduct or of his future dangerousness, § 4A1.3, or (2) the offense conduct had

3. Drew points to Application Note 2, which defines the "substantive offense" as that for which "defendant was *convicted* of soliciting, attempting, or conspiring to commit." U.S.S.G. § 2X1.1 app. n. 2 (emphasis added); *see also* § 1B1.5(a), (d). There is some ambiguity then between § 2K2.1(c)(1), which directs the Court to sentence on the basis of unconvicted conduct and the cross-referent, § 2X1.1, which is to be applied only to convicted conduct. However, this ambiguity has been resolved against the defendant expressly in two circuits, *United States v. Branch*, 91 F.3d 699, 742–43 (5th Cir.1996); *United States v. Smith*, 997 F.2d 396, 397 (8th Cir.1993), and implicitly in others. *See, e.g., Fenner*, 147 F.3d at 366 (upholding sentence enhancement by application of § 2K2.1(c) cross reference to guideline for murder, where defendant had been acquitted of murder in state proceeding); *Lombard II*, 102 F.3d at 3 (by application of cross reference defendant was "given a life sentence based on a finding that he committed the two murders of which he was earlier acquitted."); *see also United States v. Flennory*,

145 F.3d 1264, 1267–69 (11th Cir.1998); *United States v. Myers*, 112 F.3d 406, 410–11 (9th Cir. 1997); *United States v. Voyles*, 995 F.2d 91, 93 n. 3 (6th Cir.1993).

4. *See United States v. Roberts*, 898 F.2d 1465, 1470 (10th Cir.1990) (victim held at knifepoint is "physically restrained"); *United States v. Stokley*, 881 F.2d 114, 116 (4th Cir.1989) (bomb threat can physically restrain victim); *cf. United States v. Harris*, 959 F.2d 246, 265 (D.C.Cir.1992); *see generally* Russell G. Donaldson, Annotation, *Construction of the Provision of United States Sentencing Guidelines § 3A1.3 (18 U.S.C.A. Appx) Authorizing Upward Adjustment of Sentence If Victims of Crime Were "Physically Restrained" By Accused*, 116 A.L.R. Fed. 593 (1993 & Supp.).

5. The Government also argued for a two-level, victim-related enhancement under § 3A1.1(b), on the theory that Mrs. Drew was particularly susceptible to Mr. Drew's criminal conduct. The evidence adduced at sentencing was insufficient to make this showing.

attendant aggravating circumstances, § 5K2.0, such as extreme psychological injury, § 5K2.3, or extreme conduct, § 5K2.8. The Court has carefully considered the evidence, the arguments, and the entire record. This was a very serious offense that did considerable damage to the Drew family. Nonetheless, recognizing that it is within the power of the Court to depart upwards in this case, the facts are such that no departure is warranted.[6]

 Mr. Drew argued for a downward departure on the basis of diminished mental capacity. *See* U.S.S.G. § 5K2.13. By its terms, that departure is available only where the offense committed was "non-violent." Here again, the "real offense" sentencing system asserts itself, for in this Circuit the determination of whether an offense is "non-violent" under § 5K2.13 is a question of fact and is not determined by reference to the charged offense alone. *See United States v. Chatman,* 986 F.2d 1446, 1453 (D.C.Cir. 1993); *cf. United States v. Askari,* 140 F.3d 536, 549 (3d Cir.1998) (en banc); *see also United States v. Leandre,* 132 F.3d 796, 803 (D.C.Cir.1998). The standard for determining "non-violent" offenses may soon be refined, because—in order to resolve a circuit split over the meaning of "non-violent" offense in § 5K2.13—the Sentencing Commission has sent to Congress a proposed change that would make a diminished-capacity departure unavailable where "the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence." *United States v. Askari,* 151 F.3d 131, 131 (3d Cir.1998) (quoting proposed amendment).

In this case, under either the *Chatman* standard or the standard announced in the Sentencing Commission's proposed amendment, the Court finds that the offense in this case was not a "non-violent" offense and therefore a § 5K2.13 departure is not available. Moreover, even if such a downward departure were available, the record in this

matter demonstrates that such a departure would not be warranted. *See Leandre,* 132 F.3d at 803–05.

## D. Other Considerations

Two other matters deserve brief consideration, even though Mr. Drew did not raise either.

### 1. Voluntariness of Drew's Guilty Plea

 Drew has not asked to withdraw his plea, and the Court would not be inclined to allow him to do so. *See United States v. Horne,* 987 F.2d 833, 837 (D.C.Cir.1993) (setting forth the three factors to be considered). But the principal reason that is so is because the Court took pains to insure that Mr. Drew understood his choices before he tendered his plea. *See* Transcript of Hearing, June 2, 1998, at 9–10, 16–32. One of the difficulties facing a defendant contemplating a guilty plea is the inability to gauge his sentencing exposure with much precision. *See Horne,* 987 F.2d at 838–39 (Buckley, J., writing separately for the Court) (recognizing that "[i]n some instances, then a defendant pleading guilty will be torn between his counsel's predictions and the trial judge's admonitions that reliable estimates must await the issuance of the presentence report").

In this case, it appears that Mr. Drew was advised by his counsel before the plea hearing that his likely Guideline range would be 27 to 33 months. *See* Tr. at 17. That impression may have been reinforced by Government counsel's mention of a sentencing exposure of two to three years, *id.* at 9, 20, notwithstanding the Government's current argument that Drew should receive a sentence of 10 years. But at each stage of what could be termed the "pre-plea colloquy," the Court admonished Mr. Drew that he could not rely on these predictions when making his plea decision, and that the statutory 10-year maximum was the only information of which he could be certain. For example:

---

**6.** With respect to the Government's reliance on *United States v. Brewster,* 127 F.3d 22, 25–26 (1st Cir.1997), in that case the defendant had engaged in a 17-year campaign of domestic abuse. *Id.* at 26. While agreeing that uncharged domes-

tic abuse can form the basis for an upward departure under § 4A1.3, the Court finds in this case that the facts are sufficiently distinguishable from *Brewster* that a departure is not warranted.

MR. BYRNES [AUSA]: ....

....

Now under the plea agreement that we worked out we essentially take the hammer away from his head on a series of life sentences. We will have allowed Mr. Drew to plea to a count that at its best would confine him for about two to three years from his perspective. The government would reserve the right—

THE COURT: You say at its best. I don't want there to be any misunderstanding, we can deal only with the statute at this moment which says no greater than 10 years, it does not prescribe a minimum. However under the Guidelines there are so many variables that it's impossible at this time to tell what the sentence will be, but clearly there would be a Guideline sentence involved in this case. I cannot tell at this moment [what] the maximum or the minimum would be, or indeed the actual sentence. I just want that clear as you're speaking so that there is no misunderstanding while Mr. Drew hears what you're saying. It is important because obviously Mr. Drew is not a lawyer and most people don't understand this even if they are lawyers, so it is important that there not be any misunderstanding.

Tr. at 9–10; *see also* Tr. at 42–45 (colloquy between the Court and Mr. Drew regarding sentencing ramifications of plea). Indeed, defense counsel recently has acknowledged that Drew understands this. *See* Def.'s Sentencing Mem. at unnumbered p. 4 ("Wilbert Drew understands and appreciates that this Court could sentence him to incarceration for up to ten years and/or impose a fine up to $250,000.").

Thus, this is not a case like *United States v. Watley*, in which the court found that the defendant's plea was not voluntary where defendant was given incorrect information regarding his *maximum* sentencing exposure. 987 F.2d 841, 843–47 (D.C.Cir.1993). In this case, the Court is confident that Mr. Drew understood when he pled guilty that he could receive a sentence of up to 10 years notwithstanding the apparent predictions of his counsel or the Assistant United States Attorney.

## 2. Due Process

■ Drew also does not argue that application of the cross reference, U.S.S.G. § 2K2.1(c)(1), amounts to a violation of due process in this case. That is perhaps because under the due process standard set forth in *McMillan v. Pennsylvania*, 477 U.S. 79, 86–90, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), there is little choice but to conclude that the twofold sentence enhancement in this case survives constitutional scrutiny.

It is true that there is considerable force to the argument that the cross reference in U.S.S.G. § 2K2.1(c)(1)(A), by substituting the sentencing range for unconvicted conduct— here, attempted murder—for the range that otherwise would apply for unlawful possession of a gun, does create a new offense with a distinct penalty. *See McMillan*, 477 U.S. at 88, 106 S.Ct. 2411; *United States v. Lombard*, 72 F.3d 170, 177–78 (1st Cir.1995) [hereafter *Lombard I* ] ("Despite the nominal characterization of the murders as conduct that was considered in 'enhancing' or 'adjusting' Lombard's firearms conviction, the reality is that the murders were treated as the gravamen of the offense."); *see also* Yellen, *Real Offense Sentencing*, 78 Minn. L.Rev. at 434–35.

But, the competing and prevailing view is that under the cross reference the unconvicted conduct is not actually the offense for which the sentence is imposed, rather it is considered only to enhance the penalty within the statutory range prescribed for the convicted offense of unlawful possession of a firearm. *See Witte v. United States*, 515 U.S. 389, 403–04, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995); *McMillan*, 477 U.S. at 87–88, 106 S.Ct. 2411; *Fenner*, 147 F.3d at 366; *United States v. Corbin*, 998 F.2d 1377, 1383–85 (7th Cir.1993); *cf.* Kevin R. Reitz, *Sentencing Facts: Travesties of Real–Offense Sentencing*, 45 Stan. L.Rev. 523, 546 & n. 157 (1993). Until there is law to the contrary, the Court is forced to accept this view.[7]

---

7. A subsidiary point, which has split the First and the Fourth Circuits is whether the magnitude of a § 2K2.1(c)(1) enhancement provides the basis for a downward departure under either

But the acceptance is reluctant. The Sentencing Commission's choice to substitute the guideline for unconvicted conduct in place of the guideline for convicted conduct is one of judicial policy. *See* U.S.S.G. Ch. 1 Pt. A (1997) (The Sentencing Commission "is an independent agency in the judicial branch ...."). And, as Judge Boudin, my former colleague on this Court and now a judge of the First Circuit, has noted, "many judges think that the guidelines are manifestly unwise, as a matter of policy, in *requiring* the use of acquitted conduct in calculating the guideline range." *Lombard II*, 102 F.3d at 5 (emphasis added) (citation omitted); *see also United States v. Concepcion*, 983 F.2d 369, 395 (2d Cir.1992) (Newman, J., concurring) ("[I]t is high time for both the Commission and the courts to give serious reconsideration to the decisions that underlie [an] outcome" by which a defendant "faces virtually the same sentence that he would have received had he been convicted[ ]" of the relevant conduct); *United States v. Singh*, 1994 WL 510053 (S.D.N.Y.1994). I find myself in the company of those judges.

To be clear, the objection is not to the use of a real offense system *per se*, because information pertaining to extra-element conduct certainly is relevant in distinguishing between more or less culpable offenders. *Accord* O'Sullivan, *Defense of Modified Real-Offense System*, 91 Nw. U.L.Rev. at 1367–68 ("the weight of thoughtful commentary supports this conclusion"). The cause for judicial pause is the Guidelines' *compulsory* substitution of the guideline for relevant conduct in place of the guideline for the convicted conduct. *See, e.g., Lombard II*, 102 F.3d at 4; *Hahn*, 960 F.2d at 908. *But see United States v. Carroll*, 3 F.3d 98, 101–02 (4th Cir.1993) (per curiam); *Corbin*, 998 F.2d at 1385.

A sentencing policy that restored some, if not all, of the pre-guidelines discretion in determining the impact of relevant-conduct evidence on the sentence would reduce the appearance that the Government can use sentencing as an end-run around the procedural guarantees required for a criminal trial and allow for more carefully calibrated sentence enhancements. *Cf. Nichols v. United States*, 511 U.S. 738, 752–53, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994) (Souter, J., concurring in the judgment) (with respect to criminal history, approving Guidelines approach because "the role prior convictions play in sentencing is presumptive, not conclusive ....").

### *CONCLUSION*

In this case, Mr. Drew pled guilty to unlawful possession of a firearm, but the Guidelines Manual requires that he be sentenced as if he had been convicted of assault with intent to commit first degree murder. By separate Judgment, the Court has done so, and Mr. Drew has been sentenced to a period of incarceration of 80 months. In this case, the punishment does fit the crime, however unsavory the method of calculation required to produce the sentencing range. But a sentencing system that would have allowed the Court to weigh all of the evidence as contributing to a determination of just punishment would be preferable and would avoid the appearance of unfairness created by mechanical application of sentencing law that applies to unconvicted conduct.

---

U.S.S.G. § 5K2.0 or as a due process curative. *Compare Fenner*, 147 F.3d at 363–67 (no departure available) *with Lombard I*, 72 F.3d at 183–85 (departure available). Drew has not requested a downward departure on this basis. Even if he had, and assuming *arguendo* that the Court had authority to depart, a departure would not be warranted on this record. *See Lombard I*, 72 F.3d at 186.