Boudreau v. Englander, et al.          CV-09-247-SM  09/04/09  P

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Robert H. Boudreau

   v.                                    Civil No. 09-cv-247-SM
                                       Opinion No. 2009 DNH 133P

Dr. Celia Englander, et al.

## REPORT AND RECOMMENDATION

Before the Court is Robert Boudreau's request for a temporary restraining order and a preliminary injunction (document no. 2). Boudreau requests reinstatement of medical treatment adequate to address his chronic back pain. A hearing was held on Boudreau's motion on August 13 and 14, 2009. After careful consideration of the evidence and argument submitted by the parties, I recommend that Boudreau's motion for a temporary restraining order be denied, and his motion for a preliminary injunction be granted.

### Request for a Temporary Restraining Order

If a party seeks the issuance of a temporary restraining order without written or oral notice to the adverse party, the court may only grant relief if plaintiff (A) files an affidavit or verified complaint clearly showing "that immediate and

irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b) (governing the issuance of temporary restraining orders by the Court). In this case, plaintiff's pleadings satisfy neither of these requirements. Accordingly, I recommend that the motion for a temporary restraining order be dismissed. I will apply the evidence in this matter only to my consideration of plaintiff's request for a preliminary injunction.

Background

I. Robert Boudreau

Robert Boudreau is an inmate of the New Hampshire Department of Corrections ("DOC"), presently housed at the Northern New Hampshire Correctional Facility ("NCF"), where he has been since April 2009. Prior to that, he had been housed at the New Hampshire State Prison for Men in Concord, essentially since 2002. Boudreau's present imprisonment commenced in June 2006 when he was reincarcerated on a parole violation after serving only "a couple days" on parole release.

Boudreau injured his back lifting a wood stove at work in 1997, prior to being incarcerated.  He suffered three ruptured or herniated disks.  He received Workers' Compensation benefits for his back injuries.  Boudreau had two back surgeries prior to entering the prison, in 2000 and 2002, and had a third back surgery in December 2006 while he was incarcerated.

Boudreau's 2006 surgery was performed by Dr. Ross Jenkins at Dartmouth Hitchcock Medical Center ("DHMC").  After the surgery, Dr. Jenkins advised Boudreau that further surgery was not in his best interest, and that he should try to obtain pain relief by maintaining his pain medication regimen, and taking other pain-relief measures, such as the use of a T.E.N.S. Unit,[1] and consulting with a pain management specialist.

Since then, Boudreau has seen Dr. Robert Beasley, a pain management specialist at DHMC.  At Boudreau's first appointment with Dr. Beasley, on March 17, 2009, Dr. Beasley recommended that Boudreau undergo a branch block, a procedure wherein the nerves communicating pain messages to Boudreau's brain are severed or

_____

[1] A T.E.N.S. Unit, or Transcutaneous Electric Nerve Stimulation Unit, is  a pocket-sized battery-operated device that uses electric impulses, administered via electrode pads placed on the painful area of the body, to block nerve pain signals to the brain.

burned, relieving Boudreau of pain for a period of time. Boudreau would then return to other pain management options. Dr. Beasley advised Boudreau that one of the risks of the procedure was paralysis, and Boudreau chose not to take that risk and declined the procedure.[2] Boudreau again saw Dr. Beasley on July 20, 2009, at which time he underwent a procedure involving injecting local anesthetic into his spine. Boudreau testified that the procedure was excruciatingly painful, and that it did not entirely resolve his pain.

Boudreau testified that he was first prescribed narcotic pain medication for his back pain at the prison in 2004 or 2005 by DOC Nurse Practitioner Brett Mooney. After Boudreau saw Mooney a couple of times, he was treated, until recently, by Dr. Celia Englander, the Chief Medical Officer for the DOC, who has prescribed narcotic pain medication to him since that time. Dr. Englander's most recent prescribed dosage of MS Contin[3] was 210mg

---

[2]Dr. Celia Englander, Chief Medical Officer for the DOC, testified that paralysis is not a risk of a branch block procedure. Dr. Englander, however, also stated that she does not perform this procedure, and referred Boudreau to Dr. Beasley because he is a specialist in this area.

[3]MS Contin, or morphine sulfate, is morphine in an extended release formula. The witnesses in this matter used these terms, as well as simply calling the drug "morphine," interchangeably, although they are not precisely the same thing. For purposes of

per day.  Boudreau testified that that dosage, which was increased from his previous dosage of 180mg daily at the end of 2008[4], was working reasonably well for him, as he can function and move around on that dosage, and because he has a T.E.N.S. Unit to treat breakthrough pain  Dr. Beasley's report of the March 17, 2009 appointment with Boudreau recommended methods for Boudreau to increase his pain control without increasing his opioid dosage.  To do that, Dr. Beasley recommended branch blocks, and the addition of a prescription for Cymbalta, a pain-relieving medication, possibly in combination with Wellbutrin or Effexor, and possibly Neurontin, a medication used to treat nerve pain.  Once Boudreau was able to obtain better pain control, Dr. Beasley suggested that Boudreau get into an exercise program designed to strengthen his back and core musculature.  Dr. Beasley did not recommend decreasing or terminating the opioid treatment at that time.  Dr. Beasley also stated in his report that he would wait to hear from Dr. Englander before scheduling

_____

my determination of plaintiff's request, however, it is a distinction without a difference.

[4]The medical witnesses at the hearing testified that patients often develop tolerance to morphine and other narcotic medications over time and require periodic increases in dosage to continue to obtain the pain-relieving benefits of the drugs.

any nerve block procedures. Dr. Englander testified that she has not seen Boudreau to treat him and that she has not met with him or changed his medications since December 2008.

Boudreau saw Dr. Beasley again in July 2009, but no report from that meeting was entered in evidence. Boudreau testified that the appointment with Dr. Beasley was uncomfortable because Dr. Beasley believed he was there to have branch block procedures when, in fact, Boudreau declined those procedures.

In the months before the circumstances that gave rise to this lawsuit arose, Boudreau had informally heard from various DOC medical staff members that inmates were going to be removed from medications due to budget concerns within the DOC. Additionally, Boudreau became aware that a number of inmates had been seen by DOC physician Dr. John Eppolito, and he was removing them from their pain medications.

In June 2009, Boudreau received notice that he was scheduled for an appointment, which he did not request, with Dr. Eppolito on June 30, 2009. Boudreau, fearing that his medications might be taken from him, or that Dr. Eppolito might not be aware that he had Workmen's Compensation benefits that would cover the expenses of his medical care, brought a lot of his medical

6

records to that appointment and the information regarding his benefits. Boudreau also brought with him a draft of a civil rights lawsuit that he intended to file in the event that Dr. Eppolito sought to interfere with Boudreau's pain treatment.

According to Boudreau's testimony, when he arrived at the scheduled appointment with Dr. Eppolito on June 30, 2009, the doctor, who was sitting behind a table, introduced himself and told Boudreau that he was there to review all of the narcotic pain management medications being given to inmates for budgetary reasons. Dr. Eppolito, when he testified, vehemently denied saying anything related to budgetary concerns during the June 30 appointment. Boudreau testified that he then showed Dr. Eppolito that his medications were covered by his Workmen's Compensation benefits. Dr. Eppolito commented that Boudreau was on a high dose of morphine. Boudreau, who admits that he became hostile to Dr. Eppolito shortly into the conversation, told Dr. Eppolito that his treating physicians and specialists, including his back surgeon and a pain specialist, had either prescribed or approved his present dosage of medications, and that he felt more confidence in their opinions regarding his care than in Dr.

Eppolito's opinion, as Dr. Eppolito was neither an expert in pain management nor had he ever treated Boudreau.

Dr. Eppolito then broached the subject of removing Boudreau from his narcotic medication. Boudreau told Dr. Eppolito that he needed his medication, and that if he was removed from his medication, he would file a lawsuit against Dr. Eppolito. Dr. Eppolito then had Boudreau removed from the office without further discussion. No physical examination took place. While conceding that Boudreau threatened only to sue him, and not to physically harm him, Dr. Eppolito stated that during this conversation with Boudreau, he was more afraid for his life than he had ever been, including the four years he had worked with inmates. Dr. Eppolito stated that Boudreau's behavior was more frightening to him even than that of another, larger, inmate, who specifically threatened to kill him. Dr. Eppolito also claimed that he would have examined Boudreau at that appointment had Boudreau not gotten aggressive with him. Dr. Eppolito, however, described in his progress notes that the appointment was an "interview," rather than an examination. Further, none of the other inmates who testified about seeing Dr. Eppolito for a similar initial meeting were examined during that meeting. I

8

find that Dr. Eppolito, whether he said this with the intent to bolster the dramatic effect of his testimony, or because he is misremembering the incident, is not believable on this point.

A corrections officer, Terry Oliver, testified that he was present outside the room during the June 30 appointment between Boudreau and Dr. Eppolito. Oliver testified that he was standing outside the open door of the room, and that, for the most part, the two carried on "a normal conversation." Oliver's attention was drawn, however, when he heard Boudreau's and Dr. Eppolito's voices rise. Oliver stepped up to the doorway of the room and saw Boudreau with paperwork in his hand, which Dr. Eppolito wanted to see. Boudreau said it was a lawsuit that he was going to file. Dr. Eppolito then said to Boudreau that he was threatening him with the lawsuit, and that the appointment was over, and he wanted Oliver to remove Boudreau from the room. Oliver escorted Boudreau out of the examining room and into the waiting room. Oliver did not feel it was necessary to write Boudreau up on disciplinary charges for any of his actions during that incident. I find that Oliver's version of events is the most objective and believable regarding the tone and conduct of both Boudreau and Dr. Eppolito at the June 30, 2009 appointment.

9

Anticipating that he was likely to be sued by Boudreau if he removed Boudreau from his medication, Dr. Eppolito wrote copious notes concerning the June 30 meeting. Dr. Eppolito's progress notes from the meeting indicate that he reviewed Boudreau's chart prior to the meeting, and that his impression of Boudreau, based on his review of Boudreau's chart, was as follows:

> [Patient] is a 35 year old male that has an extensive [history] of chronic back pain. [Patient] has had several surgeries in the past. (3). Today I am interviewing [patient] to see if current therapy is helping with his pain. [Patient] has been on MS Contin. [Patient] was seen by Spine Center DHMC. Recommendation for addition of Neurontin or Cymbalta for pain management. [Patient] was also recommended to have nerve blocks. Review of the record does not demonstrate that these recommendations have been followed.

After the 11:00 a.m. meeting with Boudreau, Dr. Eppolito wrote the following notes:

> I had a discussion with [patient] that I would order the recommended tests. When I brought up the topic that [patient] may benefit from a drug holiday, [patient] presented a document that he described as a law suite [sic]. [Patient] stated he knew that his meds were going to be reviewed. [Patient] stated I will see you in court. Officers Oliver and Nancy Murphy saw this document.
>
> I will certainly follow through with DHMC Spine Center recommendations.

10

> I feel strongly that [patient] was attempting to influence my medical decisions by threatening to bring legal action against me if I elect to manage [patient] differently. This behavior is an attempt to strong arm, intimidate, me. This is a form of extortion. I strongly belive [sic] that I need to be aggressive with [patient]'s pain management. [Patient] will be sent to DHMC but I do not feel comfortable in continuing current management. 1) [Patient] states that he is in pain and needs an increase in his MS Contin. Current recommendations for pain management with narcotics - recommends one of two choices for chronic pain despite receiving opioids: (1) increase the dose of the opioids, or (2) D/C (discontinue the opioid). [Patient] was unwilling to hear of my plan other than his MS Contin. I have decided that [patient]'s behavior and aggressive attitude and lack of appropriate pain relief is an indicator to taper his narcotic over a long period of time. I will follow DHMC recommendations.

A half an hour later, at 11:30 a.m., Dr. Eppolito wrote the following progress note:

> I spoke to Dr. Jenkins at NH Spine Center he thought that narcotic taper would be appropriate if [patient] still having pain on his current doses. I called Somersworth Pain Clinic (Chris Clough) he said that a drug holiday would be a reasonable idea at this time (and if [patient] made a threat of legal action) he would be fired from their practice. I will not change [patient]'s dose of MS Contin at this time. I have spoken to Dr. Jenkins and Chris Clough. I will seek the advice of Dr. John Richmond staff M.D. at DOC, Pain Management [?].

11

Dr. Eppolito then went on to order Neurontin and a consultation with the DHMC Spine Center for branch blocks.

Dr. Eppolito scheduled another appointment to see Boudreau on July 14, 2009. Knowing that he had been hostile during their last meeting, Boudreau testified that he tried to be civil during this meeting, and to be sure that there were corrections officers who were able to witness the meeting. During the July 14 meeting, Dr. Eppolito told Boudreau that he was going to taper him off of his narcotic pain medication because Boudreau was seeking more medication. Boudreau, losing his civility at that point, called Dr. Eppolito a "lying piece of shit," and other names, and said that he had not asked for more medication since being placed on his current dose. Boudreau and Dr. Eppolito then got into a screaming match and Dr. Eppolito again had Boudreau removed from his office. There was no physical examination. Dr. Eppolito testified that during that meeting, Boudreau indicated that he did not want Dr. Eppolito to treat him. Boudreau's narcotic medication taper began that day. When Dr. Eppolito first took the stand, he indicated that he ordered an eight week taper of Boudreau's medication. Later, Dr. Eppolito conceded that the taper was actually only about five or six weeks long.

12

After the July 14 meeting with Boudreau, Dr. Eppolito wrote the following progress note:

> I called DHMC Pain Clinic myself. Phone not sent to Dr. Englander. Returned. Recommendation for tapering MS Contin [secondary] to adverse consequence of hormone suppression. [Patient] treatment has been ineffective we will try meds that could be more effective. [Patient] will be seen by Pain Management at DHMC later this month. I will follow their recommendations. [Patient] informed that MS Contin will be tapered. [Patient] very aggressive provoking/at me. [Patient] threatening again. [Patient] stood up pointing finger. [Meeting] was ended. [Patient] not examined. CO D. Watson present [] [patient].

Dr. Eppolito testified that his decision to take Boudreau off of the MS Contin was based on the fact that Boudreau was on a high dose that wasn't working to control his pain. Dr. Eppolito largely relied, for his conclusion that the medication wasn't working, on Boudreau's agitation and hostile behavior, which he attributed to overmedication on opioids. Dr. Eppolito testified that he did not consider other possible reasons for Boudreau's behavior, such as Boudreau being in fear of being taken off of medication he believed was necessary to control his pain, or anger because he believed that the decision was financial, and not medical.

13

Boudreau testified that while he was being tapered off of MS Contin, members of the medical staff, including Nurse Practitioner Judy Baker, tried to have Dr. Englander rescind the taper order, due to Boudreau's poor condition without the medication, as the pain had become unmanageable. Dr. Englander stated that she could not interfere with Dr. Eppolito's orders regarding pain management.

Dr. Eppolito prescribed Mobic, an anti-inflammatory medication, for Boudreau. Boudreau wrote to Dr. Eppolito because he was concerned about taking the medication because Mobic is possibly harmful to people with certain heart conditions, and, Boudreau reports, he has had a heart attack, and is on medication for high blood pressure. In addition, Boudreau believed Mobic to be contraindicated with some of his other medications. Dr. Eppolito testified that the risk of heart attack from the Mobic is small, and may be outweighed by the benefits of the medication if inmates experience pain relief. It does not appear, however, that Dr. Eppolito responded to Boudreau, or followed up with him personally after Boudreau wrote to him to express his concerns. Boudreau no longer takes Mobic.

14

Boudreau testified that he also attempted to take Neurontin prescribed by Dr. Eppolito, but was vomiting a lot and could not tolerate the medication, and stopped taking it after one to two weeks. Dr. Eppolito stated that patients sometimes have to put up with certain unpleasant side effects, such as nausea or sleepiness, to gain the benefit of a medication. Dr. Eppolito testified that other pain medications, Cymbalta or Lyrica, could be used for Boudreau's pain, but that he has not prescribed either of those for Boudreau.

At the time of the hearing, Boudreau stated that his only pain relief comes from his T.E.N.S. Unit as he was close to the end of his taper off of the MS Contin. Dr. Eppolito also prescribed ibuprofen but Boudreau testified that it does not help to relieve his pain.[5] On the first day of the hearing, a

---

[5]Prescriptions of ibuprofen by DOC medical personnel, however, are categorically limited at this time. Inmates may receive a total of 90 doses of ibuprofen in a ninety day period. Accordingly, an inmate prescribed ibuprofen three or four times a day, like Boudreau, are only able to receive that medication for three or four weeks before being cut off for two months. Dr. Eppolito testified that this was to avoid the side effects that can occur with ongoing use of these medications. Eschewing the risk/benefit assessment he touted to support his prescription of Mobic in the case of a heart patient, Dr. Eppolito stated that the DOC no longer chooses to incur the risks of ibuprofen in order to gain any pain-relieving benefits it might have after the 90 dose limit is reached. However, inmates who are able to purchase ibuprofen from the prison canteen can supplement their

15

Thursday, Boudreau testified that NCF had run out of batteries and electrode pads, and so he was not able to use his T.E.N.S. Unit. Boudreau testified that batteries and pads are available only on Thursdays at 1:30 p.m., and that if your batteries or pads run out on Friday, you cannot obtain new ones until the following week. When he appeared for the second day of the hearing, a Friday, Boudreau had been provided with pads and batteries overnight. Boudreau stated that he uses his T.E.N.S. Unit approximately twenty hours per day to try to obtain some pain relief. Prior to being removed from his medication, Boudreau needed to use the T.E.N.S. Unit only once every couple of weeks.

Boudreau was offered Trazadone, but was wary of the side effects of psychiatric medication, and declined it. Baker has given Boudreau Benadryl, an antihistamine, to help him sleep. At the time of the hearing, Boudreau was almost entirely weaned off of the MS Contin.

Boudreau testified that he is in agony. The Court noted during the two days of the hearing that Boudreau was obviously

use of the drug in any way they choose. Another exception to the rule is that patients in the DOC's newly formed Pain Management Clinic can get the medication they need prescribed without regard to the blanket limitation.

extremely uncomfortable, particularly on the first day of the hearing, and frequently grimaced when he attempted to move or change positions, even at times when he did not have reason to expect that people would be watching him. Further, all of the medical professionals who testified, or whose opinion was heard in evidence, stated that they had no reason to doubt Boudreau's chronic pain is real. I find, based on his testimony, my own observations, and the other evidence presented at the hearing, that Boudreau's present pain is significant and genuine.

Dr. Eppolito testified that no pain management plan was ever put in place for Boudreau, either before or after he directed the taper of his pain medication. At the time of the hearing in this matter, Dr. Eppolito stated that he intended to have Boudreau meet with the newly formed Pain Management Clinic ("PMC"), and intended to create a plan for Boudreau in the "near future," but that he had yet to do so and yet to even set a date for such a meeting. Accordingly, there is no plan in place for Boudreau and no action has been taken to create such a plan.

Dr. Eppolito also claimed that Boudreau had expressed that he did not want to be seen for treatment by Dr. Eppolito. Dr. Eppolito, however, took detailed notes of both of his encounters

17

with Boudreau, and never mentioned Boudreau's refusal to be treated by him. I find it much more likely that Dr. Eppolito did not actually think that Boudreau was refusing treatment, but that Dr. Eppolito has chosen not to see Boudreau again, based on his own fear of being sued. In fact, once Boudreau told Dr. Eppolito that he intended to sue him, Dr. Eppolito was so concerned about the threat of a lawsuit that he stopped seeing patients that day and spoke to Dr. Robert MacLeod, the Chief Administrator of Medical and Forensic Services at the DOC, about what he should do to protect himself legally. Dr. MacLeod advised Dr. Eppolito to make sure that the file was well-documented, including what had occurred and the times and dates of occurrence. Further, contrary to Dr. Eppolito's assertions that he felt that he could not take further action because Boudreau did not want to be treated by him, Dr. Eppolito indicated, in both the progress notes he made and testimony provided at the hearing, that he intended to see Boudreau again and to treat him in the future, including having him participate in the PMC, referring him to outside specialists, tapering his MS Contin, and continuing to prescribe new medication for him during the taper.

18

Dr. Eppolito's disinclination to see Boudreau once the lawsuit was filed is also implied by the fact that the last medical action taken on Boudreau's behalf, according to the testimony, an appointment with Dr. Beasley on July 20, 2009, coincided with the date this lawsuit was filed. Further, even accepting as true Dr. Eppolito's assertion that he intends to set an appointment to review Boudreau's case with the PMC treatment team, his significant delay in doing so, particularly for an inmate who has been removed from his effective pain medication, is troubling.

II. Other Inmates

    A. Larry Schultz

Other inmates testified at the hearing regarding their recent experience with pain medications at the DOC. Larry Schultz testified that he has been incarcerated in the DOC for four and a half years and chronic pain in his back and legs resulting from a 1997 work-related injury. Schultz stated that Dr. Eppolito prescribed narcotics for him in 2008, and that over time, as he grew tolerant to the pain-alleviating effects of the medication, his dosage had to be increased. On July 7, 2009, Schultz was called to the medical department to see Dr. Eppolito,

19

who advised him that he was taking him off of his narcotic medication. Schultz protested, stating that, if anything, he needed his medication increased, not decreased, as the dosage he was on was not as effective as it had been. Dr. Eppolito prescribed Mobic and weaned Schultz off of the narcotics. Schultz was unable to tolerate the Mobic, because he has acid reflux disease, a condition that can be worsened by the medication. He now receives a muscle relaxant, but no pain medication and no other treatment to help him manage his pain.

Drs. Englander and Eppolito testified that if inmates are caught "cheeking" or hiding their medications to be given or sold to other inmates, they presume that the inmates do not need the medication. Schultz was caught "cheeking" medication twice in late 2008. Schultz, however, testified that he continued to receive his narcotic medication, prescribed by Dr. Eppolito, after that date, and that Dr. Eppolito did not mention the prior "cheeking" of his medication as a reason for weaning Schultz off of his medications.

B.    Richard Chenard

Another inmate, Richard Chenard, testified that he has been taking narcotic medication for five months for chronic arthritis

20

pain in his elbows, back, and feet. His medication was prescribed by Dr. Englander. In mid-July 2009, Chenard testified that he was among approximately fifteen inmates called to the NCF medical department. Chenard saw Dr. Eppolito there. Dr. Eppolito told Chenard that his narcotic pain medication was likely to be terminated. He did not give Chenard a reason for terminating his medication. Dr. Eppolito told Chenard that he would be seen again, but Chenard has not received any further appointments and his medication has not yet been reduced. Chenard stated that all of the other inmates who went in to see Dr. Eppolito that day came out of his office stating that Dr. Eppolito was going to terminate their pain medication, but that no one had been given a reason for the termination.

C. Anthony Renzzulla

Anthony Renzzulla, who has been a DOC inmate since July 2005, testified that he too takes narcotic pain medication, and has since he arrived at the prison for chronic back pain from back surgeries and a motorcycle accident. Renzzulla had been on pain medication prior to his incarceration. Both Dr. Englander and Dr. Eppolito have prescribed morphine for Renzzulla at the prison. Since July 2005, Renzzulla's morphine dosage has

21

increased to accommodate his growing tolerance to a high of 270mg daily.[6] Because Renzzulla's medication was not completely relieving his pain, Dr. Englander has sent him to the DHMC Pain Management department and to the Catholic Medical Center over the last several years to try to find a way to reduce his pain. Neither of those offices recommended that Renzzulla's pain medications be reduced.

Renzzulla testified that several months ago, he began to hear rumors that medical care would be changing and that Dr. Eppolito would be taking over pain management cases at the prison. Approximately two months ago, Renzzulla expected to be released on parole, and saw Dr. Eppolito in order to prepare medically to leave the prison. Inmates leave prison with a 30-day supply of non-narcotic medications they are taking. Accordingly, Renzzulla had to choose between tapering off of his narcotic medications prior to his release, or withdrawing from them on the streets after his release. Renzzulla initially chose to try to taper his medications, but was unable to tolerate the

---

[6]Renzzulla testified that shortly after he started taking morphine at the prison, Dr. Eppolito decreased his dosage slightly, to 30mg daily from the 45mg daily Dr. Englander prescribed, but Dr. Englander represcribed 45mg daily a couple of months later.

pain, and decided he would prefer to risk withdrawal on the street than continue the taper. Renzzulla told Dr. Eppolito he wanted to return to his effective dose of medication. At that point, Dr. Eppolito told Renzzulla that it was no longer his choice, and that the tapering of his morphine would continue.

No other pain medication was provided to Renzzulla to treat his pain, although he, like Boudreau, was given Benadryl to help him sleep. Renzzulla was prescribed Mobic, but states that he didn't take it because he had a heart attack six years ago, and the packaging insert with the medication indicated that it could cause heart attacks and strokes, particularly for people with prior heart problems. Additionally, the insert said that Mobic is contraindicated with one of Renzzulla's heart medications.

Renzzulla was not paroled as anticipated. He now expects to serve approximately three and a half more years in prison. Renzzulla met with Dr. Eppolito and told him of his change in circumstances. Renzzulla understood that this meeting was a "Phase Two" meeting with members of the PMC team. At this point, Renzzulla received his first physical examination from Dr. Eppolito. Dr. Eppolito also, for the first time, took a medical history from him at that appointment. Renzzulla stated that

23

during that meeting he became agitated because he was in pain and not getting much sleep, although the taper of his medications had been halted by medical staff due to Renzzulla's obvious discomfort. After the Phase Two appointment with the PMC, Renzzulla's medication was left at the level at which the taper was stopped.

Renzzulla had another appointment with Dr. Eppolito on August 11, 2009, at which point Dr. Eppolito and other members of the PMC were trying to test his range of movement and physical capabilities. Renzzulla told Dr. Eppolito that he was in too much discomfort to do any bending or twisting, or any physical activity at all. After that meeting, Dr. Eppolito, after consultation with DOC physical therapist Bernadette Campbell, agreed to raise Renzzulla's morphine to 180mg per day, and also to put him on another medication, a corticosteroid, to help with pain.

D. <u>Gary Porter</u>

Gary Porter has been incarcerated at the DOC for fourteen years. Porter testified that he began taking narcotic pain medication at the prison seven years ago. The first four years Porter took narcotics to relieve pain from a broken wrist. Three

years ago, Porter's right shoulder was dislocated and he hurt his left shoulder. Since then, Porter's shoulder pain has been managed with the use of narcotic drugs. The drugs were first prescribed by DOC physician Dr. Freedman, and since then, have been prescribed by Dr. Englander. Porter received these medications until just prior to the hearing in this matter.

Porter testified that on June 18, 2009, he met with Dr. Eppolito, at the doctor's initiative, who he had never seen before. The appointment slip Porter received stated that he was to see the "Pain Clinic," but when he arrived, he only saw Dr. Eppolito. Dr. Eppolito told Porter that he was reviewing all cases where inmates were taking narcotic drugs. Dr. Eppolito stated that it was okay for a person on the streets to take narcotic pain medications, as those medications can be paid for by the patient, but that the DOC cannot afford to pay for narcotics for inmates. Porter then challenged Dr. Eppolito's ability to adequately treat him, as Dr. Eppolito had never treated him before, and he had not reviewed all of Porter's files. Dr. Eppolito asked Porter to lift his arms until he felt pain. Porter replied that he always felt pain. Dr. Eppolito did not perform any other examination. Dr. Eppolito then ordered

25

that Porter's narcotic medications be tapered. Porter was removed completely from his medications by July 31, 2009.

Porter saw Dr. Eppolito again on August 4, 2009, after he wrote a request slip stating that he had been suffering from severe withdrawal symptoms since his medication had been reduced, his pain levels were increasing, and he wanted for his medication to be increased again. Dr. Eppolito refused to reinstate an effective dosage of Porter's narcotic medication. In place of the narcotic medication, Dr. Eppolito prescribed Mobic, which did nothing to alleviate Porter's considerable pain.

E.   Alfred Avery

Inmate Alfred Avery testified that he has been incarcerated at the DOC for approximately five years. Avery has been receiving narcotic pain medication at the prison for approximately five years for back pain. Avery was born with spina bifida, a birth defect that causes him pain. Avery's condition limits his ability to engage in physical activity and exercise and even makes it difficult for him to get out of bed. He is unable to work. Avery has been treated during his incarceration by Dr. Englander, who has treated his pain with steroid injections and morphine.

26

Avery testified that his pain increased after he had a heart attack a year and a half ago.  Avery had heart surgery, and had three stents placed, and had an internal defibrillator implanted in his chest.  Avery is currently waiting for a heart transplant.  Avery's morphine prescription treats both the pain  caused by his heart condition and his back pain.

In June 2009, Avery had a medical appointment with Dr. Eppolito, which was made at Dr. Eppolito's initiative.  When Avery saw Dr. Eppolito, the doctor told him that he was going to discontinue his narcotic medication and replace it with Mobic.  Avery took the Mobic, and it caused his internal defibrillator to go off.  Avery testified that Mobic is contraindicated for someone with his cardiac history,[7] but that Dr. Eppolito did not inquire into his heart condition before changing his medication.

Dr. Eppolito told Avery that he was being removed from his narcotic medications because he had been issued a disciplinary infraction report alleging that two inmates had bought narcotics from him in March 2009.  The suspected buyers, however, tested negative for narcotics, so Avery's medications were not

---

[7]The package insert for Mobic states that "USE OF THIS MEDICINE IS NOT RECOMMENDED if you . . . are going to have or have recently had coronary artery heart bypass (CABG) surgery." Pl. Ex. 4.

discontinued at the time of the alleged incident. There were no intervening incidents that would give rise to a suspicion that Avery was doing anything other than taking his prescribed pain medication himself.

Dr. Eppolito also told Avery that there was too much prescribing of narcotics occurring at the prison in general, and that the prison was going to try other things to manage both inmate pain and the cost of treatment. Dr. Eppolito did no physical examination. Avery stated that he was so angry that his medication was being discontinued, he ended the meeting with Dr. Eppolito.

Avery's medications were discontinued after a one-week taper. Avery has not seen Dr. Eppolito since the June 2009 meeting. Dr. Eppolito did not see Avery when his defibrillator went off. Avery has gone to sick call seven times since his medication was discontinued to complain about his pain. He was given Naproxen, but was unable to tolerate the gastrointestinal side effects. Avery has not been given any other pain medication. Avery testified that he now suffers from chest and back pain and that he has recently met with Dr. Englander. Dr. Englander increased Avery's anxiety medication and reinstated his

heart medication, which he had not received in eight months. Dr. Englander advised Avery, however, that while his pain medication is out of her hands, as all narcotic pain medication was being handled by Dr. Eppolito, she would try to forward information to Dr. Eppolito regarding the clean drug tests from March 2009 that had cleared Avery to continue his pain medication.

Avery stated that he was told by a nurse that he was the first inmate to be removed from pain medication. Members of the DOC nursing staff, prior to his meeting with Dr. Eppolito, had told Avery that there were large efforts to make budget cuts going on, and that cutting back on medications was part of an effort to cut expenses.

F.    Douglas Kern

Inmate Douglas Kern testified that he has been incarcerated for three and a half years. Kern suffers from back pain resulting from degenerative disk disease that he has had, and been treated for with narcotics, since 1995, when he was involved in an industrial accident at work. In 1998, the State of New Hampshire determined that Kern was totally and permanently disabled. Prior to his 2005 incarceration, Kern was receiving treatment from the Northeast Pain Clinic in Somersworth, New

Hampshire, where he was being treated with narcotic pain medications.

Shortly after he arrived at the prison, Kern was prescribed a narcotic pain medication to treat his back pain. At the end of June 2009, NCF nurses told Kern that everyone was going to be taken off of their medications. Several days later, Kern met with Dr. Eppolito, who he had never seen before. Dr. Eppolito told Kern that a review board was reviewing all of the narcotic pain medication usage at the DOC to determine whether inmates needed to be on the narcotics they had been prescribed.

Dr. Eppolito asked Kern how he was doing on the narcotic medication. At the time, Kern was taking 120mg of morphine daily. Kern advised Dr. Eppolito that he felt his morphine dose was not quite strong enough and that he felt it needed to be increased. Dr. Eppolito advised Kern that that was not going to happen, and that he could see nothing in Kern's file to indicate that such a high dose of medication was appropriate. Kern then questioned Dr. Eppolito as to what qualified him to make decisions about medication and pain management in his case when he had never seen him before and he was not the prescribing doctor, an orthopedic specialist, or a neurologist. Kern asked

30

Dr. Eppolito if his pain medication was being reduced due to budget cuts, which Dr. Eppolito denied.

Within a week of his meeting with Dr. Eppolito, Kern's pain medication was reduced by half, and maintained at that level for four weeks. Kern's narcotic medication was replaced with a thirty-day prescription for Mobic. After two weeks, Kern had had no pain relief from the Mobic and stopped taking it. After four weeks on 60mg of morphine per day, Kern was then transferred to a halfway house where he spent seven days detoxing from the medication, which was not sent to the halfway house with him. Kern was then sent back to the Minimum Security Unit at the prison because he was deemed to be too sick to complete the prerelease program at the halfway house, whether or not he was on medication. Kern has not seen Dr. Eppolito since the first meeting.

III. The Pain Management Clinic

The DOC has been, for the last two years, working on developing the PMC within the DOC. This effort came about after the DOC medical department investigated statistical evidence purportedly demonstrating that the DOC was prescribing narcotic pain medication for inmates with chronic pain at a significantly

higher rate than another larger corrections department providing quality care to its inmates.[8] The PMC is intended, according to the testimony of Dr. Eppolito, Dr. Englander, and Dr. MacLeod, to improve the delivery of treatment and improve outcomes for inmates with chronic pain. The PMC will, ideally, establish nutritional, physiological, therapeutic, surgical, pharmaceutical, mental health, and medical interventions that will serve to assist inmates in addressing the underlying problem causing pain and thus allow them to have less pain and a better quality of life. The PMC is designed to treat pain in a more wholistic manner that will provide the inmate with a variety of

---

[8]To be clear, there was minimal statistical evidence provided at the hearing. Dr. MacLeod testified that another corrections department, serviced by the same company from which the DOC contracts doctors, was prescribing narcotics for chronic pain management at a significantly lower rate than the DOC medical department. Dr. MacLeod, who is not a medical doctor, advised the court that he had satisfied himself that the other corrections department was providing high quality health care. Many questions are left unanswered, however, by the statistics and observations upon which these conclusions were based. For example, no evidence was presented to show that the population in the larger corrections department and the DOC were similar enough to be statistically relatable. Also, Dr. MacLeod's testimony begs the question as to how he made the determination that the other corrections department's care was of a high quality. Finally, of course, even if valid and reliable, the statistical and observational information provided regarding narcotics dosing in the prison population does not bear on whether or not Boudreau received adequate medical care for his chronic pain.

measures, while minimizing the potential for harm.  Importantly, the effort to create the PMC was also motivated by the fact that routine treatment of chronic pain with narcotic medications can cause a number of medical problems, such as hormone suppression, problems with immune sufficiency, and impairment of cognitive functioning.

While Dr. Eppolito was loathe to identify himself as the head of the PMC, he is the only physician involved in the PMC, and he is the only physician or treating medical professional at the DOC who can prescribe medication for chronic pain.  The evidence presented made clear that ultimate responsibility for the medical decisions made by the PMC rests with Dr. Eppolito.

Dr. Eppolito testified that his intention was to evaluate inmates' medical history and files, meet with the inmate, and then meet with the PMC team to determine the best plan of action for each individual inmate.  Dr. Eppolito's testimony also made it quite clear that he is motivated, not just by the individual patients and their situations, but by a desire to, overall, reduce the amount of narcotics prescribed for chronic pain management.

Dr. Eppolito testified that he began to see patients, in the context of reviewing their individual pain management situations, in approximately mid-June 2009. This has involved reviewing inmates' charts, obtaining medical records not in the possession of the DOC, and actually meeting with patients. The first inmates to be seen were the group taking morphine to manage chronic pain, which both Dr. Englander and Dr. Eppolito estimated to be about thirty inmates. At the time of the hearing, Dr. Eppolito estimated he had met with approximately 20 of these inmates. Dr. Eppolito was unable, or unwilling, to make a guess as to how many of these patients' morphine prescriptions he had terminated or modified after these meetings.

The development of the PMC is a laudable effort on the part of the DOC medical department. According to the testimony of the DOC witnesses, the PMC intends to utilize the talents of a number of disciplines, including medicine, psychotherapy, psychiatry, physical therapy, nutrition, and physiology, in tandem to treat not just chronic pain, but the entire person who suffers from pain. In this way, the PMC attempts to provide its patients with their best chance at a successful, productive, and pain-free, or pain-minimized life. The PMC, if effective, will attempt to do

34

this without incurring some of the risks presented by the methods presently used at the prison, which consists mainly of treating pain with narcotics and other drugs, and providing physical therapy or service by outside professionals as necessary. The DOC's present methods of pain management fail to incorporate exercise, nutrition, mental health and other factors that can impact the experience of pain.

My understanding of the plan for the operation of the PMC is that first, a patient's chart, history, medical records and present treatment are assessed to determine where a patient has been in terms of his pain treatment. Next, Dr. Eppolito meets with the inmates to assess their current condition and treatment. Dr. Eppolito then meets with other members of the PMC team and the inmate to discuss a plan for the inmate's pain treatment going forward. If utilized as designed, and if both inmates and DOC staff follow through with the procedures anticipated and the plans developed, the PMC, it appears, will serve the inmates and the institution well by providing the inmates with the opportunity for genuine health and life improvement.

IV.  Budgetary Issues

As noted above, a number of inmates, including Boudreau, made reference during their testimony to having heard talk among the DOC medical staff, including Dr. Eppolito, about budgetary cuts that were in the offing, and that were motivating planned cuts in inmates' medications.  Dr. MacLeod testified that in the planning of the PMC and the discussions among DOC medical personnel, including defendants here, concerning reducing the amount of narcotics prescribed for inmates, budgetary concerns were not a factor in deciding what medications would be prescribed to patients.  Dr. Eppolito concurred that there were no budgetary restrictions placed on his ability to prescribe medications and that the cost of various medications did not enter into his consideration regarding whether or not to prescribe narcotic pain medications.  Dr. MacLeod also testified that the cost of narcotic pain medication is a minimal part of the DOC medical department's budget, and is not something he has considered a problem area financially.  I find that there is inadequate evidence to support Boudreau's assertion that the removal of his pain medication was motivated by budgetary concerns.  As I pointed out during the hearing in this matter,

36

however, and discussed below, Boudreau does not have to prove that he was denied adequate pain treatment because it was too expensive, he has to demonstrate that he was denied adequate pain treatment because of the deliberate indifference of the defendants to his serious medical need.

## Discussion

### I. Standard of Review

Preliminary injunctive relief is available to protect the moving party from irreparable harm, so that he may obtain a meaningful resolution of the dispute after full adjudication of the underlying action. See Jean v. Mass. State Police, 492 F.3d 24, 26-27 (1st Cir. 2007). Such a situation arises when some harm from the challenged conduct could not be adequately redressed with traditional legal or equitable remedies following a trial. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18 (1st Cir. 1996) (finding irreparable harm where legal remedies are inadequate); see also Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994) (explaining irreparable harm and its effect on the contours of preliminary injunctive relief). Absent irreparable harm, there is no need for a preliminary injunction. The need to prevent irreparable harm, however,

37

exists only to enable the court to render a meaningful disposition on the underlying dispute. See CMM Cable Rep., Inc. v. Ocean Coast Props., 48 F.3d 618, 620-21 (1st Cir. 1995) (explaining the purpose of enjoining certain conduct as being to "preserve the 'status quo' . . . to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs"); see also Stenberg v. Cheker Oil Co., 573 F.2d 921, 925 (6th Cir. 1978) ("The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.").

A preliminary injunction cannot issue unless the moving party satisfies four factors which establish its need for such relief. See Esso Std. Oil Co. v. Monroig-Zavas, 445 F.3d 13, 17-18 (1st Cir. 2006) (discussing the requisite showing to obtain a preliminary injunction); see also Ross-Simons, 102 F.3d at 18-19 (explaining the burden of proof for a preliminary injunction). Those factors are: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted

with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." Esso Std. Oil, 445 F.3d at 18. "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). Yet, "the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem." Ross-Simons, 102 F.3d at 19.

II. Preliminary Injunction Factors

A. Likelihood of Success on the Merits

Boudreau's civil action raises claims alleging that he was subject to inadequate medical care during his confinement in violation of the Eighth Amendment.[9] The crux of Boudreau's underlying claims is that the failure to provide him with adequate medication or other treatment for his significant and

_____

[9]Boudreau's complaint also asserts claims alleging retaliation and violations of state law. Because I find that Boudreau has sufficiently demonstrated likelihood of success on the merits of his inadequate medical care claim, it is not necessary for me to determine whether he is likely to prevail on his other claims for purposes of making a recommendation on Boudreau's request for preliminary injunctive relief.

39

chronic pain violates rights guaranteed to him by the federal constitution. "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 33 (1993); see Giroux v. Somerset County, 178 F.3d 28, 31 (1st Cir. 1999).

The Supreme Court has adopted a two-part test for reviewing claims under the Eighth Amendment's cruel and unusual punishment clause. See Farmer v. Brennan, 511 U.S. 825, 834 (1994); Helling, 509 U.S. at 25; Hudson v. McMillian, 503 U.S. 1, 7 (1992). Jail officials have an obligation under the Eighth Amendment to protect inmates from prison officials acting with deliberate indifference to their serious medical needs. See Farmer, 511 U.S. at 831. To assert a viable cause of action for inadequate medical care, a prisoner must first state facts sufficient to allege that he has not been provided with adequate care for a serious medical need. See id.; Rhodes v. Chapman, 452 U.S. 337, 347 (1981); Estelle v. Gamble, 429 U.S. 97, 106 (1976). The inmate must then allege that a responsible prison official was aware of the need or the facts from which the need could be

inferred, and still failed to provide treatment.  See Estelle, 429 U.S. at 106.

"[A]dequate medical care" is treatment by qualified medical personnel who provide services that are of a quality acceptable when measured by prudent professional standards in the community, tailored to an inmate's particular medical needs, and that are based on medical considerations.  See United States v. DeCologero, 821 F.2d 39, 42-43 (1st Cir. 1987).  This does not mean that an inmate is entitled to the care of his or her choice, simply that the care must meet minimal standards of adequacy. See Feeney v. Corr. Med. Servs., 464 F.3d 158, 162 (1st Cir. 2006) ("When a plaintiff's allegations simply reflect a disagreement on the appropriate course of treatment, such a dispute with an exercise of professional judgment may present a colorable claim of negligence, but it falls short of alleging a constitutional violation.") (internal citations omitted). Deliberate indifference may be found where the medical care provided is "so clearly inadequate as to amount to a refusal to provide essential care."  Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991).  Constraints inherent in a prison setting may affect the choice of care provided and may be relevant to whether

41

or not prison officials provided inadequate care with a deliberately indifferent mental state. Wilson v. Seiter, 501 U.S. 294, 302 (1991).

A serious medical need is one that involves a substantial risk of serious harm if it is not adequately treated. See Barrett v. Coplan, 292 F. Supp. 2d 281, 285 (D.N.H. 2003); Kosilek v. Maloney, 221 F. Supp. 2d 156, 180 (D. Mass. 2002) (citing Farmer, 511 U.S. at 835-47); see also Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990) (defining a serious medical need as one "that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.") (internal citations omitted). The undisputed testimony from Boudreau as well as Drs. Eppolito and Englander, was that Boudreau's back condition is serious, chronic, likely permanent, and extremely painful. I find that Boudreau unquestionably has a serious medical need which requires treatment, and that the DOC medical department is keenly aware of both his condition and his needs.

To satisfy the second prong of an Eighth Amendment claim, a prisoner must allege that prison officials "have a 'sufficiently

culpable state of mind.'  In prison conditions cases, that state of mind is one of 'deliberate indifference' to inmate health or safety."  Farmer, 511 U.S. at 834 (internal citations omitted). Dr. Eppolito's approach to pain management appears to begin with the presumption that, due to its potentially negative health effects, the use of narcotic pain medication is to be avoided unless absolutely necessary.  I find that, while his intentions may be good in terms of granting greater and less harmful pain control to the prison population in general, that at least in Boudreau's case, Dr. Eppolito failed to adequately treat Boudreau's serious medical condition.

Dr. Eppolito acted with deliberate indifference to Boudreau's pain.  Dr. Eppolito prescribed medications that Boudreau couldn't take due to his heart condition or intolerable side effects, and, despite the availability of other pain medications, such as Cymbalta or Lyrica, other narcotics or even the option of halting the MS Contin taper, Dr. Eppolito failed to prescribe any medication or treatment that helped to alleviate Boudreau's pain.

Dr. Eppolito's claim that he felt Boudreau should be tapered off of the medication so as to be seen by Dr. Beasley in his

native state is not credible. Despite deciding to taper Boudreau's medication on June 30, potentially having Boudreau nearly off of the medication by his July 20 appointment with Dr. Beasley, Dr. Eppolito waited until July 14, six days before the appointment to begin the taper. This hardly put Boudreau in his native state. Further, there is no indication that Dr. Eppolito ever contacted Dr. Beasley to ask what he would prefer in terms of Boudreau's medications or that Dr. Beasley ever suggested that Boudreau should be seen in an unmedicated state.

As stated, Dr. Eppolito waited two weeks beyond the first meeting to make that order, although all of his work on Boudreau's case was done within a half an hour of his initial appointment with Boudreau. Dr. Eppolito testified that he left Boudreau on a potentially dangerous medication for two weeks after determining it should be stopped because he wanted a letter from Dr. Beasley in Boudreau's file supporting that decision. Dr. Eppolito wanted the letter, not to shore up his medical position or to assure himself that this was the right decision to make, but to help himself in the lawsuit he anticipated would be filed as soon as he gave the order to reduce the medication, so that when he was sued, he could rely on that letter as the reason

44

he tapered Boudreau's medications, rather than have to bear responsibility, and potentially face legal liability, for that decision, because he believed he'd be sued. In Dr. Eppolito's own words, his intentions were to "cover [his] bottom," not to provide the best possible care for Boudreau. That is why Dr. Eppolito reported to the doctors he did consult with that Boudreau was seeking an increase in medication.[10] I found Boudreau's testimony that he did not seek an increase in morphine from Dr. Eppolito to be credible, and find that Dr. Eppolito relied improperly on Dr. Englander's outdated notes and Boudreau's hostility to support his assertion that Boudreau requested an increase as well as to solidify his defense to anticipated litigation.

---

[10]There was some confusion among the witnesses, which, after hearing the testimony and reading the medical records as to when Boudreau requested that Dr. Englander raise his medication dosage. Some of the witnesses relied on Dr. Beasley's March 17 report that indicated that Boudreau was referred to him for continued pain on a 210mg daily MS Contin dose. It appears, however, that the T.E.N.S. Unit mostly addressed that pain. Boud Boudreau's actual request for additional medications was made to Dr. Englander when Boudreau saw her in either October or December 2008, which request prompted the appointment with Dr. Beasley. Dr. Beasley, knowing that request had been made prior to the March 2009 appointment, did not recommend a taper of medications, but instead recommended branch blocks and adding more medications to the pain management plan for Boudreau while maintaining Boudreau on his prescribed dosage of MS Contin.

Dr. Eppolito's in-court speech avowing his commitment to treating Boudreau's pain, to welcoming him into the PMC with open arms, and to having no ill feelings whatsoever to a man who, only weeks ago, he claims, put him in fear for his life was, I find, self-serving and disingenuous posturing created for the benefit of the Court. Dr. Eppolito's concern for Boudreau would have been more convincing had Dr. Eppolito even attempted to see Boudreau since July 14, prescribed another medication, or taken any steps at all toward helping to relieve Boudreau's excruciating pain. A vague intention to meet with other PMC staff members to discuss Boudreau's case "in the near future" does not adequately counter Boudreau's proof that Dr. Eppolito was, and remains, deliberately indifferent to his present ongoing pain.

Dr. Eppolito, after ordering the taper, did not follow up with Boudreau to assess his pain or the impact of the taper. He did not know whether or not Boudreau was receiving physical therapy, he clearly did not know of Boudreau's reaction to Neurontin or Mobic, as he never prescribed Cymbalta, Lyrica, or anything else to replace them, and he had no specific plan to meet with the pain management team regarding Boudreau's care

46

until such time as his name "came up on the list." As I stated in court, I believe that Dr. Eppolito jumped the gun in reducing Boudreau's medication. In doing so, Dr. Eppolito usurped the function of the PMC team. The testimony was clear that inmates should be assessed to determine their present condition, should have the opportunity to be seen and evaluated by the PMC team, and then meet with the team in order that an appropriate plan might be developed and then implemented. In this case, Dr. Eppolito briefly saw Boudreau, never examined him, never met with the team or made any specific plan to meet with the PMC team members, and simply implemented a taper of Boudreau's medications. Medications, while ultimately the responsibility of Dr. Eppolito as the physician member of the PMC, were, as I understood the testimony, to be considered as part of a wholistic treatment plan.

It is beyond question that an extremely antagonistic relationship has developed between Dr. Eppolito and Boudreau. When he waited two weeks to begin a medication taper for no other reason than to have a letter in the file to protect himself, Dr. Eppolito demonstrated that he will place his legal interests above Boudreau's medical needs. Accordingly, the Court finds

that Dr. Eppolito can not function effectively as Boudreau's physician any longer.  Further, because he is the head of the PMC, the Court finds that the PMC is likely to be affected by Dr. Eppolito's bias against Boudreau, and is thus unlikely to be able to develop a treatment plan free from Dr. Eppolito's bias toward Boudreau.  Nevertheless, the Court must insure that Boudreau receives the pain management that he needs.  Accordingly, I find that the only way to have Boudreau's pain properly assessed and treated is to direct that Boudreau be evaluated by a pain management specialist who is entirely independent of the prison, at the DOC's expense, within thirty days of the date this Report and Recommendation is approved, if, in fact, it is approved.[11] The DOC will be directed to provide the assessing physician with a copy of Boudreau's entire medical file in its possession, as well as a copy of this Report and Recommendation.  The defendants are specifically directed not to say, write, or otherwise communicate anything, directly or indirectly, except what is contained in the medical records, to the assessing physician to attempt to influence that physician's opinion one way or another with regard to appropriate treatment for Boudreau.

---

[11]The independent medical professional may be, but does not have to be, Dr. Beasley.

48

While I would never suggest that a DOC physician was required to put himself or herself in harm's way to treat an aggressive patient in order to demonstrate that he was not deliberately indifferent to that patient's needs, or that it is acceptable for a patient to act in a threatening manner in order that he might be allowed to choose the doctor or treatment he wants, there must be some way for the DOC to recognize that some doctor/patient relationships may be unsuccessful, and need either to be repaired, or replaced with a relationship that works. Similarly, it should hardly be surprising to anyone working in a prison context that some prisoners with chronic pain might not be agreeable and pleasant when receiving bad news. A prison medical department must be able to accommodate those situations.

B.    Irreparable Harm

The evidence before the Court demonstrates that, if no injunction is granted, Boudreau will continue to suffer from excruciating pain. The sole source of pain relief plaintiff has had, his T.E.N.S. Unit, was not even functioning at the start of the hearing because Boudreau was not provided with electrode pads or batteries until after his attorney advised the court of the situation. The prison provided those items to Boudreau that

49

night.  The evidence demonstrated that the DOC medical staff has denied him adequate pain treatment and have no plan in place to provide him with additional care.  This is, I find, beneath the level of adequacy contemplated by the Eight Amendment.  I find further that Boudreau is demonstrably likely to suffer irreparable harm if the lack of treatment for his pain is allowed to continue.

C.   Balance of Hardships

The DOC has been medicating Boudreau for four years for pain, and witnesses testified that, through the PMC, the DOC medical department is well-equipped to treat chronic pain within the institution.  Accordingly, given the suffering Boudreau will endure without treatment, and the DOC's demonstrated ability to treat chronic pain, I find that the balance of hardships weighs in favor of granting preliminary injunctive relief in this case.

D.   Public Interest

The public interest is well-served by assuring adherence to the Eighth Amendment prohibition against cruel and unusual punishment that includes allowing human beings to live in severe pain without adequate treatment when such treatment is available. There is no public interest served by failing to provide adequate

50

medical care to inmates in accordance with their documented serious medical needs. For that reason, I find the public interest weighs in favor of issuance of a preliminary injunction in this case.

Conclusion

Because I find that Boudreau is likely to succeed on the merits of his underlying claims, that he will likely be irreparably harmed in the absence of an injunction, that the balance of hardships weighs in favor of the plaintiff, and that the public interest is best served in this matter by granting the requested relief, I recommend that the following injunction issue:

1. The DOC is directed to arrange to have Boudreau evaluated by a physician specialist in pain management who is entirely independent of the prison[12] within thirty days of the date this Report and Recommendation is approved, if, in fact, it is approved. The assessing physician should make specific recommendations for Boudreau's pain treatment going forward, independent from the influence of all DOC physicians, nurses, and personnel. This evaluation will be at the DOC's expense.

---

[12]The independent medical professional may be, but does not have to be, Dr. Beasley.

2.    The DOC is directed to provide the assessing physician with a copy of Boudreau's entire medical file, as well as a copy of this Report and Recommendation.

3.    The defendants are specifically directed not to say, write, or otherwise communicate anything, directly or indirectly, except what is contained in the medical records, to the assessing physician to attempt to sway that physician's opinion one way or another with regard to appropriate treatment for Boudreau.

4.    The defendants are directed to follow any and all of the recommendations made by the assessing physician.

5.    If the defendants feel they cannot provide care for Boudreau in accordance with the recommendation of the pain specialist, they must file a motion showing cause, within 7 days of the injunction order in this case or within 7 days of receiving the specialist's recommendations, as to why they cannot follow the doctor's recommendations may not be followed.

As previously noted, relations between Boudreau and the DOC medical staff are clearly strained.  I leave it to the parties in this case to repair those relationships if possible, or to figure out how to otherwise to insure the smooth provision of adequate medical care to Boudreau in the future.

52

Any objections to this report and recommendation must be filed within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order. See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

_____
James R. Muirhead
United States Magistrate Judge


Date:      September 4, 2009

cc:        Michael J. Sheehan, Esq.
           James W. Kennedy, Esq.
           Edward M. Kaplan, Esq.